**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

RICKY LEE EARP,
*Petitioner-Appellant,*

v.

S.W. ORNOSKI, WARDEN, OF
CALIFORNIA STATE PRISON AT SAN
QUENTIN,*

*Respondent-Appellee.*

No. 03-99005

D.C. No.
CV-00-06508-R

ORDER
AMENDING
OPINION AND
DENYING
PETITIONS FOR
REHEARING AND
PETITIONS FOR
REHEARING EN
BANC AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
Manuel L. Real, District Judge, Presiding

Argued and Submitted
July 14, 2005—Pasadena, California

Filed September 8, 2005
Amended December 16, 2005

Before: Jerome Farris, Dorothy W. Nelson, and
Richard C. Tallman, Circuit Judges.

*Pursuant to Fed. R. App. P. 43(c)(2), S.W. Ornoski, the current custodian, is substituted for John Stokes as Warden of California State Prison at San Quentin.

16433

Opinion by Judge Tallman

## COUNSEL

Robert S. Gerstein, Santa Monica, California, for the petitioner-appellant.

Dean R. Gits, Office of the Federal Public Defender, Los Angeles, California, for the petitioner-appellant.

James William Bilderback II, Deputy Attorney General, Los Angeles, California, for the respondent-appellee.

---

## ORDER

The opinion filed September 8, 2005, slip opinion at 12700 and published at 423 F.3d 1024 (9th Cir. 2005), is amended by the opinion filed concurrently with this order. With these amendments, the panel has voted to deny the petition for rehearing and the petition for rehearing en banc filed by the Appellant and the petition for rehearing and the petition for rehearing en banc filed by the Appellee.

The full court has been advised of the petitions for rehearing en banc filed by the Appellant and the Appellee and no judge of the court has requested a vote on either.

The Appellant's petition for rehearing and petition for rehearing en banc is DENIED and the Appellee's petition for rehearing and petition for rehearing en banc is DENIED. No further petitions for rehearing or rehearing en banc may be filed.

---

## OPINION

TALLMAN, Circuit Judge:

Ricky Lee Earp is on death row in San Quentin, California, after being convicted in Los Angeles County of the 1988 rape and murder of eighteen-month-old Amanda Doshier. The jury convicted Earp of first-degree murder and found three death-qualifying special circumstances to be true: rape, sodomy, and lewd and lascivious conduct on a child under the age of fourteen. In the separate penalty phase, the jury recommended that Earp be put to death for his crimes. The California Superior

Court ("trial court") imposed that sentence on February 21, 1992.

All reviewing courts thus far have upheld Earp's conviction and sentence. The California Supreme Court ("state court") affirmed Earp's conviction and death sentence on direct appeal, and summarily denied his state habeas corpus petition on the merits without affording him an evidentiary hearing on any of his claims. *People v. Earp*, 978 P.2d 15 (Cal. 1999). The United States Supreme Court denied certiorari. *Earp v. California*, 529 U.S. 1005 (2000). Earp then filed a federal habeas corpus petition in the United States District Court for the Central District of California, raising nineteen constitutional claims. The district court denied Earp's habeas petition on all of them. Earp now brings this appeal.

We affirm the district court on seven of the claims Earp raises in this appeal, and vacate and remand for an evidentiary hearing on the two remaining claims.[1] This Opinion addresses Earp's claims of prosecutorial misconduct, ineffective assis-

---

[1]In a separately filed companion Memorandum Disposition we affirm the district court on six of Earp's claims. Earp made four prosecutorial misconduct claims in addition to the one discussed in this Opinion: (1) that the prosecutor committed prejudicial error under *Doyle v. Ohio*, 426 U.S. 610 (1976), by commenting on Earp's failure to name Dennis Morgan prior to trial; (2) that the prosecutor's closing statement shifted the burden of proof; (3) that the prosecutor impermissibly stated his own opinion of Earp's guilt; and (4) that the cumulative effect of these errors deprived Earp of his right to due process. We affirm the district court's summary judgment order in favor of the Warden because we agree that the state court's resolution denying these claims was neither contrary to, nor an unreasonable application of, controlling federal precedent. Furthermore, we affirm in the Memorandum Disposition the district court's decision to deny Earp an evidentiary hearing on his claims that his counsel provided ineffective assistance by not presenting his third-party defense in the opening statement and by eliciting testimony from a defense investigator. Because the record demonstrates that these were strategic choices, we hold in the Memorandum Disposition that the district court did not abuse its discretion by denying an evidentiary hearing on these claims.

tance of counsel, and conflict of interest.[2] The district court conducted a limited evidentiary hearing on his conflict claim and denied his motion for an evidentiary hearing on his prosecutorial misconduct and ineffective assistance of counsel claims. Ultimately, all of these claims were denied on summary judgment.

Here we decide whether: (1) Earp alleges facts warranting an evidentiary hearing on his claim that the prosecutor committed prejudicial misconduct by dissuading Michael Taylor from testifying; (2) Earp alleges facts warranting an evidentiary hearing on his claim of ineffective assistance of counsel for failure to sufficiently investigate mitigation evidence; and (3) Earp's counsel suffered from a conflict of interest stemming from her intimate relationship with Earp during his trial and sentencing. We hold that Earp has alleged facts which, if proven true, may entitle him to relief on his prosecutorial misconduct and ineffective assistance of counsel claims. Because Earp has never been afforded an evidentiary hearing on these claims, we remand to the district court for an evidentiary hearing on his prosecutorial misconduct and ineffective assistance of counsel claims. As to Earp's conflict claim, we hold that the state court determination that counsel was not laboring under a conflict of interest was neither contrary to, nor an unreasonable application of, established federal law because the Supreme Court has expressly limited its conflict jurisprudence to cases involving multiple, concurrent representation. We therefore affirm the summary judgment in part, reverse in part, and remand for the necessary evidentiary proceedings.

---

[2]For the remainder of this Opinion, we use the term "prosecutorial misconduct" to refer to Earp's claim that the prosecutor intimidated and threatened Michael Taylor to dissuade him from testifying, and the term "ineffective assistance of counsel" to refer to Earp's claim that his counsel provided ineffective assistance by failing to conduct adequate investigation into mitigating evidence for use in the penalty phase.

I

We recount the facts and circumstances leading to and sur-
rounding the crime and Earp's trial as necessary to understand
our opinion.[3] In August 1988, Earp was living in Palmdale,
California, with his girlfriend, Virginia MacNair. On August
22, Cindy Doshier left her daughter, Amanda Doshier, with
Earp and MacNair for a few days, as she had done several
times before. On Thursday, August 25, MacNair left for work
around 7:00 a.m., leaving Amanda with Earp. Around 3:00
p.m., a firefighter responded to an emergency call from a man
reporting that a baby had fallen down some stairs. A prelimi-
nary assessment of her injuries led the first responder to con-
clude that Amanda needed more medical attention than he
could give, so the firefighter took her to the hospital.

After the firefighter left with Amanda, Earp disappeared
and spent the next two days with different sets of friends and
family elsewhere in California before ultimately turning him-
self in to the police in Sacramento after learning that he was
being sought in connection with Amanda's death. During the
intervening time, Earp gave inquiring friends and neighbors a
host of contradictory explanations for Amanda's injuries and
his absence.

At 10:30 a.m. on Saturday, August 27, 1988, Amanda died.
Medical examinations of Amanda revealed that she had
severe bruising, blood, and tears in the rectal area and blood
and gaping in the vaginal area consistent with sexual assault.
However, no semen, sperm, or seminal fluid was found. The
medical examiner determined that Amanda's death was
caused either by multiple sharp blows to the top of the head
or severe shaking.

---

[3]We extract much of the facts and procedural history from the Califor-
nia Supreme Court opinion disposing of Earp's direct appeal, *Earp*, 978
P.2d at 27-31, confirmed by our own independent review of the record.

At trial, Earp denied sexually molesting or otherwise harming Amanda. He blamed Dennis Morgan, Amanda's grandmother's boyfriend whom Earp had met while the two served time together in prison. Dennis Morgan testified that he met Earp while they were both inmates at the Susanville prison and had helped Earp get a job after his release. He also admitted that he was a heroin addict with nineteen different aliases, but refuted Earp's assertion that he was present at MacNair's house on August 25, denied knowing where Earp was living at the time, and claimed that he did not rape or molest Amanda. He also accused Earp of asking him to testify that there was a man named Joe at the house with them, and alleged that Paul Ford, a defense investigator, told him that Earp "needed someone who could place somebody else at the house."

At the penalty phase, Adrienne Dell, Earp's attorney, presented the following evidence in mitigation: Earp's mother and aunt testified generally about Earp's family background and legal troubles as a juvenile; MacNair testified as to her and her son's visits to Earp in jail; a cook from the California Youth Authority ("CYA") testified about Earp during his juvenile confinement; and a former associate warden at San Quentin testified that Earp would pose no danger in a high-security facility and that Earp could adjust to life in prison.

II

We review de novo the district court's denial of a petition for a writ of habeas corpus, *Lambert v. Blodgett*, 393 F.3d 943, 964 (9th Cir. 2004), and the district court's grant of summary judgment, *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004). "Factual findings and credibility determinations made by the district court in the context of granting or denying the petition are reviewed for clear error." *Lambert*, 393 F.3d at 964. The district court's application of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), as well as its conclusion that the standards set forth in AEDPA

are satisfied, is a mixed question of law and fact which we also review de novo. *Id.* at 965.

Because Earp's petition was filed after April 24, 1996, federal review is circumscribed by AEDPA. *Lockyer v. Andrade*, 538 U.S. 63, 70 (2003); *see also Lambert*, 393 F.3d at 965 (citing *Woodford v. Garceau*, 538 U.S. 202, 210 (2003)). AEDPA mandates a highly deferential standard for reviewing state court determinations. Under AEDPA, a writ of habeas corpus:

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

We review de novo the district court's interpretation of AEDPA standards governing the grant or denial of an evidentiary hearing, *Baja v. Ducharme*, 187 F.3d 1075, 1077 (9th Cir. 1999), and we review for abuse of discretion the district court's ultimate denial of an evidentiary hearing based on these AEDPA standards, *Davis*, 384 F.3d at 638. In determining whether a petitioner is entitled to an evidentiary hearing under AEDPA, the district court:

> must determine whether a factual basis exists in the record to support the petitioner's claim. If it does not, and an evidentiary hearing might be appropriate,

the court's first task in determining whether to grant an evidentiary hearing is to ascertain whether the petitioner has 'failed to develop the factual basis of a claim in State court.' . . . . If [ ] the applicant has not 'failed to develop' the facts in state court, the district court may proceed to consider whether a hearing is appropriate or required under *Townsend v. Sain*, 372 U.S. 293 (1963)[ *overruled on other grounds in Keeney v. Tamayo-Reyes*, 504 U.S. 1, 5 (1992)].

*Insyxiengmay v. Morgan*, 403 F.3d 657, 669-70 (9th Cir. 2005) (quoting *Baja*, 187 F.3d at 1078).

Because a federal court may not independently review the merits of a state court decision without first applying the AEDPA standards, a federal court may not grant an evidentiary hearing without first determining whether the state court's decision was an unreasonable determination of the facts. *See Lockyer*, 538 U.S. at 71 (rejecting a line of Ninth Circuit cases requiring "federal habeas courts to review the state court decision de novo before applying the AEDPA standard of review"). *Townsend* establishes that a defendant is entitled to an evidentiary hearing if he can show that:

(1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair hearing.

*Townsend*, 372 U.S. at 313. If the defendant can establish any one of those circumstances, then the state court's decision was

based on an unreasonable determination of the facts and the federal court can independently review the merits of that decision by conducting an evidentiary hearing. *See Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004) ("If, for example, a state court makes evidentiary findings without holding a hearing and giving petitioner an opportunity to present evidence, such findings clearly result in an 'unreasonable determination' of the facts.").

[1] Accordingly, where the petitioner establishes a colorable claim[4] for relief and has never been afforded a state or federal hearing on this claim, we must remand to the district court for an evidentiary hearing. *Insyxiengmay*, 403 F.3d at 670; *Stankewitz v. Woodford*, 365 F.3d 706, 708 (9th Cir. 2004); *Phillips v. Woodford*, 267 F.3d 966, 973 (9th Cir. 2001). In other words, a hearing is required if: "(1) [the defendant] has alleged facts that, if proven, would entitle him to habeas relief, and (2) he did not receive a full and fair opportunity to develop those facts[.]" *Williams v. Woodford*, 384 F.3d 567, 586 (9th Cir. 2004).

III

In his state habeas petition and again in his federal petition, Earp argues that the prosecutor committed misconduct by intimidating a post-trial witness named Michael Taylor to prevent him from testifying in support of a new trial motion. We hold that the district court's decision to reject this claim without holding an evidentiary hearing was an abuse of discretion. *See Davis*, 384 F.3d at 638.

---

[4]In showing a colorable claim, a petitioner is "required to allege specific facts which, if true, would entitle him to relief." *Ortiz v. Stewart*, 149 F.3d 923, 934 (9th Cir. 1998) (internal quotation marks and citation omitted).

A

1

The case against Earp was comprised of strong circumstantial evidence — Amanda had been left in his care on the day of the crime, and after Amanda was taken to the hospital Earp disappeared and gave false and inconsistent explanations of what had happened to her before he surrendered to the police. At trial, the defense case hinged on a credibility battle between Earp, who claimed that Dennis Morgan had murdered Amanda, and Morgan, who testified that he had never seen Amanda or been to the house where she was fatally injured.

Earp testified that on the day Amanda was attacked, he was at home watching her and working around the house when he was interrupted by Morgan's arrival at his door. Earp claimed that he allowed Morgan into the house, but largely ignored him, hoping that he would leave. Later in the afternoon, Earp said he went outside to clean paintbrushes and, because the backyard was unfinished, Earp left Amanda inside with Morgan and the family dog. Earp testified that after approximately a half-hour, he noticed the dog was agitated and he went inside to investigate. He discovered Amanda lying motionless at the bottom of the stairs, and made a number of attempts to revive her, including performing CPR, before calling emergency services. Earp further testified that Morgan left as Earp was calling for help.

Morgan's testimony contradicted this defense. Morgan testified that he had never been in the home and did not even know where it was. He also testified that he had never seen Amanda, and that he had not molested or raped her. Notably, no trial witness other than Earp was able to place Morgan at the house on the day of the crime.

2

After the trial was over, a defense investigator located a potential jailhouse witness who might have impeached Morgan's testimony: Michael Taylor. Taylor was also an inmate at the Los Angeles County Central Jail at the time of Earp's trial, where both Earp and Morgan were being held.[5] In a series of declarations, Taylor claims that, while Earp's jury was deliberating, he overheard Morgan tell another inmate that Morgan had visited the house where Earp was watching Amanda on the day in question. Taylor insists that Morgan referred to Amanda as his "granddaughter," and expressed fear that Earp would "come after him" if he got out of jail because of Morgan's false testimony at trial.

Taylor declares that he initially told this story in a recorded statement to the defense in late 1991 or early 1992. He asserts that, later the same day, the prosecutor and a sheriff's deputy took him to a private room at the jail, verbally abused him, and told him that he would never get out if he stood by his statement. Taylor insists that although his initial statement was true, he capitulated in the face of the prosecutor's threats and retracted the statement.

B

Earp first raised his claim that these events constituted prosecutorial misconduct in his state habeas petition.[6] He argued

---

[5]Morgan was jailed on unrelated charges.

[6]Michael Taylor's potential testimony arose in two other ways in the state habeas litigation, but Earp does not pursue those arguments in this appeal. First, Earp partially based his Motion for a New Trial on the argument that Taylor's potential testimony was newly discovered evidence. The trial court denied Earp's motion for a new trial, and the denial was affirmed on direct appeal. Earp dropped this argument after direct appeal; he did not protest the new trial decision in his state or federal habeas petitions. Earp's second use of Taylor's potential testimony was in his state

in his petition that the prosecutor violated Earp's due process rights by intimidating Taylor into withdrawing his declaration. He supported his state petition with four signed declarations from Taylor, a signed declaration from defense investigator Manuel Alvarez, a declaration from Adrienne Dell, Earp's trial attorney, and a transcript of part of the prosecutor's interview with Taylor. Through these submissions to the state court, Earp proffered the factual foundation for his alleged prosecutorial misconduct claim. *See id.* at 669-70.

Without conducting a hearing, the state court denied Earp's prosecutorial misconduct claim without opinion. Earp continued to pursue his prosecutorial misconduct claim in his federal petition. He was unsuccessful before the district court as well; the federal court adopted the Warden's proposed order granting summary judgment against Earp on his prosecutorial misconduct claim. Earp appeals the district court's order.

## C

Because the factual basis for Earp's claim was adequately proffered to the state court, he is entitled to an evidentiary hearing if he has not previously received a full and fair opportunity to develop the facts of his claim and he presents a "colorable claim" for relief. *Insyxiengmay*, 403 F.3d at 669-70; *see also Williams*, 384 F.3d at 586.

## 1

**[2]** It is evident from the record that Earp has never received an opportunity to develop his claim of prosecutorial

habeas petition to support his claim of factual innocence. The state court summarily denied this claim, but Earp raised it again in his federal petition. Holding that there is no free-standing constitutional claim of factual innocence, the district court rejected this claim, and Earp has abandoned it on appeal. It is only his third use of Taylor's proffered testimony — to support his claim that the prosecutor committed misconduct — that Earp continues to pursue in this appeal.

misconduct. The issue was not presented to the trial court, but it was raised on habeas, and neither the state court nor the district court allowed him an evidentiary hearing. Because we find that such a hearing was necessary to make the credibility determination upon which rejection of Earp's claim depends, we conclude that he has not had a "full and fair" opportunity to develop the facts supporting his claim, *see Townsend*, 372 U.S. at 313, and, consequently, the state court decision summarily denying him habeas relief was based on an unreasonable determination of the facts, 28 U.S.C. § 2254(d)(2); *Taylor*, 366 F.3d at 1001.

[3] The district court resolved Earp's claim on the basis of Taylor's credibility, concluding that Taylor's declarations were "inherently untrustworthy and not worthy of belief."[7] The district court reached its credibility determination without taking the opportunity to listen to Taylor, test his story, and gauge his demeanor.[8] *See Blackledge v. Allison*, 431 U.S. 63, 82 n.25 (1977) ("When the issue is one of credibility, resolution on the basis of affidavits can rarely be conclusive . . . .") (internal quotation marks and citation omitted).

---

[7]The district court also found that Taylor's statements would not have impacted Earp's conviction and thus "did not concern material evidence" because the trial court would not have accepted them. This is also a credibility determination, because the district court reasoned that the trial court would have found the declarations untrustworthy and would have refused to consider them.

[8]The district court gave no explanation as to how it resolved the credibility contest between Taylor and the law enforcement officers in favor of the officers. One could speculate that the district court found Taylor untrustworthy because he was an inmate, but, in the absence of an evidentiary hearing to determine who was telling the truth, it remains unclear why an inmate testifying for the defense would be inherently incredible. Alternatively, one could speculate that the district court found Taylor untrustworthy because he changed his initial story, and then returned to it. But Earp's allegation is that Taylor changed his story because the prosecutor essentially threatened him, so this speculation would support Earp's allegation if the evidence Earp proffers is found to be credible.

**[4]** In rare instances, credibility may be determined without an evidentiary hearing where it is possible to "conclusively" decide the credibility question based on "documentary testimony and evidence in the record." *Watts v. United States*, 841 F.2d 275, 277 (9th Cir. 1988) (finding an evidentiary hearing unnecessary in a § 2255 case). However, such a determination is not possible here because the documentary testimony in the record is consistent with Taylor's story and Earp's claim. Otherwise, there is no evidentiary basis for the district court's judgment of Taylor's incredibility because Taylor's story is completely outside the record. *See Frazer v. United States*, 18 F.3d 778, 784 (9th Cir. 1994) ("Because all of these factual allegations were outside the record, this claim on its face should have signalled the need for an evidentiary hearing.").

**[5]** Because the veracity of the witnesses who signed the affidavits on which Earp based his claim was at issue, the claim could not be adjudicated without an evidentiary hearing on this disputed issue of material fact. Summary judgment is an inappropriate vehicle for resolving claims that depend on credibility determinations. *See Williams v. Calderon*, 48 F. Supp. 2d 979, 989 (C.D. Cal. 1998) (noting in the context of a habeas claim "[t]he Court is not to determine issues of credibility on a motion for summary judgment; instead, the truth of each party's affidavits is assumed"), *aff'd Williams*, 384 F.3d at 628; *see also United States v. Two Tracts of Land in Cascade County, Mont.*, 5 F.3d 1360, 1362 (9th Cir. 1993) (reversing and remanding summary judgment for live testimony where the district court concluded on the basis of affidavits that the affiants were not credible); *Kreisner v. San Diego*, 988 F.2d 883, 900 n.1) ("Determinations of credibility are inappropriate for summary judgment."), *amended by* 1 F.3d 775 (9th Cir. 1993); *SEC v. Koracorp Indus., Inc.*, 575 F.2d 692, 699 (9th Cir. 1978) ("[S]ummary judgment is singularly inappropriate when credibility is at issue.").

Earp has never had an opportunity to present Taylor's live testimony so that the trier of fact can judge his credibility, and

the prosecutor and sheriff's deputy have never been questioned regarding their side of the story. Thus, because we conclude that Earp has not had a full and fair opportunity to develop the facts to support his claim we hold that the state court's decision denying him relief without an evidentiary hearing to resolve the credibility dispute was based on an unreasonable determination of the facts.

2

We next consider whether Earp has alleged facts which, if demonstrated to be true, would present a colorable claim for relief. *See Insyxiengmay*, 403 F.3d at 669-70; *Williams*, 384 F.3d at 586. At this stage, Earp does not need to prove that the prosecutor committed misconduct or that his due process rights were violated; he only needs to allege a *colorable* claim for relief. *See Phillips*, 267 F.3d at 973. This is a low bar, and Earp has surmounted it.

**[6]** If the facts that Earp alleges are proven true at an evidentiary hearing, the district court might well determine that he had established that the prosecutor threatened and verbally abused Taylor, fed him an untrue story, forced him to recant the impeaching statement by Morgan on tape, and punished Taylor for assisting Earp by having Taylor removed from his job as a trustee and transferred to a significantly less desirable jail facility. It is well established that "substantial government interference with a defense witness's free and unhampered choice to testify amounts to a violation of due process." *United States v. Vavages*, 151 F.3d 1185, 1188 (9th Cir. 1998) (quoting *United States v. Little*, 753 F.2d 1420, 1438 (9th Cir. 1984)). Moreover, coercive or threatening behavior towards a potential witness may justify reversal of a defendant's conviction. *See Webb v. Texas*, 409 U.S. 95, 98 (1972); *Williams*, 384 F.3d at 601-02 ("Undue prosecutorial interference in a defense witness's decision to testify arises when the prosecution intimidates or harasses the witness to discourage the witness from testifying . . . ."). If Earp could prove his factual

claims at an evidentiary hearing, he may well establish that the prosecutor committed misconduct.[9] We note that we are not opining on what the resolution of this issue should be; we are only explaining why Earp is entitled to a hearing on his claim.

**[7]** Earp has also made out at least a colorable claim that he was prejudiced by the prosecutor's misconduct. If the facts Earp alleges are true, he may well have demonstrated that the prosecutor's misconduct precluded him from presenting a witness in support of his Motion for a New Trial.[10] *See Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) ("Few rights are

---

[9]We have considered and rejected the possibility that hearsay objections to Taylor's testimony would preclude Earp's claim. Hearsay testimony should not be necessary in the district court because in order to establish Earp's claim, Taylor would need to testify as to how the prosecutor treated him and how he reacted (by withdrawing his statement); the actual content of Taylor's statement would not be particularly relevant to this inquiry. If Earp is granted relief on this claim and the case against him is ultimately retried, Taylor's testimony would likely be admissible under California evidence rules as an inconsistent statement, *see* Cal. Evid. Code §§ 770, 1235, as impeachment evidence, *see* Cal. Evid. Code §§ 780(h), 785, or possibly also as a statement against penal interest, *see* Cal. Evid. Code § 1230. We thus conclude that hearsay concerns do not preclude a finding that Earp has alleged facts which, if proven, would entitle him to relief.

[10]Although this evidence did not come to light until after the trial had concluded, Earp sought a new trial based on newly discovered evidence, including Taylor's statement impeaching Morgan's testimony. Because this is a state conviction the California standard for granting a new trial must guide our prejudice analysis. *Horton v. Mayle*, 408 F.3d 570, 576 (9th Cir. 2005). Under California law, a new trial will be granted if: (1) the evidence is newly discovered; (2) the evidence is not cumulative; (3) the evidence is "such as to render a different result probable on a retrial of the cause;" (4) "the party could not with reasonable diligence have discovered and produced it at the trial;" and (5) that the "facts be shown by the best evidence of which the case admits." *People v. Martinez*, 685 P.2d 1203, 1205 (Cal. 1984). In looking to California law, we are not addressing the merits of Earp's Motion for a New Trial. The only question before us is whether Earp has presented a colorable claim of constitutional harm; in other words, whether these facts, if proven true, may have entitled him to a new trial.

more fundamental than that of an accused to present witnesses in his own defense."). Furthermore, because Earp's defense strategy at trial so clearly pitted Earp's credibility against Morgan's, evidence that Morgan was lying could have created a reasonable doubt with the jury that would have made the difference for Earp. *See Silva v. Brown*, 416 F.3d 980, 987(9th Cir. 2005) ("Impeachment evidence is especially likely to be material when it impugns the testimony of a witness who is critical to the prosecution's case."). If Earp can demonstrate that prosecutorial misconduct prevented Taylor from impeaching Morgan, he may be able to establish that he was deprived of his right to present Taylor as a witness on his behalf, that he should have been granted a new trial to prove his defense, and that this deprivation may well have affected the outcome.

The district court's conclusion that Earp has not demonstrated any potential prejudice hinges on the credibility determination that we have already concluded cannot be made on summary judgment. The district court says that it assumed the credibility of Taylor's declarations, but concluded that even if the prosecutor committed misconduct, Earp was not prejudiced because the trial court would not have accepted Taylor's testimony had it been offered because the court would not have found it credible.[11] Had the trial court actually heard

---

[11]The district court reached this conclusion by adopting the trial court's conclusion that Taylor was untrustworthy. Just as we could not accept the district court's credibility judgment based only on Taylor's written statements, we cannot accept its reliance upon a trial court credibility judgment that suffered from the same deficiency in resolving a credibility dispute without a hearing. The trial court never received a declaration from Taylor. Rather the defense submitted a declaration from its defense investigator, allegedly because the prosecutor's misconduct forced Taylor to withdraw his declaration. Although the trial court held that it would have denied relief "even if this was a declaration by [Taylor] himself" because any such declaration "would appear" to be "inherently untrustworthy," that does not change our analysis. The documentary testimony in the record is consistent with Taylor's story and Earp's claim, and Taylor's tes-

Taylor testify and determined that he was not credible, we would probably defer to the trial court's credibility judgment as an established fact and would likely conclude that Earp had not raised a colorable claim of prejudice. *See Torres v. Prunty*, 223 F.3d 1103, 1109 (9th Cir. 2000). However, because no court has properly considered Taylor's credibility, we have no basis upon which we may hold that the facts Earp alleges do not establish a colorable claim of prejudice by prosecutorial misconduct.

Instead, we hold that Earp has established entitlement to an evidentiary hearing because the facts he alleged may show that the prosecutor committed a constitutional due process violation by prejudicially dissuading Michael Taylor from testifying. We remand for an evidentiary hearing so that Earp will have an opportunity to prove the facts supporting his claim.

IV

Earp argues that he was denied effective assistance because his counsel's investigation was insufficient, resulting in a "large body of relevant mitigating material" being kept from the jury in the penalty phase. Specifically, Earp argues that defense counsel's failure to properly investigate and follow up on leads unearthed by the defense investigator resulted in the failure to uncover and present the following mitigating evidence: (1) extensive records of Earp's schooling, documenting a history of emotional problems and possible psychological or neurological problems; (2) further information about Earp's family background, his history of substance

---

timony is completely outside the record. *Cf. People v. Jefferson*, 303 P.2d 1024, 1028-29 (Cal. 1957) (upholding trial court's credibility determination after the trial court weighed conflicting affidavits and defense counsel had an opportunity to elicit testimony from the affiants during trial). Consequently, the trial court had no basis to judge Taylor's credibility without conducting an evidentiary hearing.

abuse and mental problems, especially in light of his family history of alcoholism, depression, and suicide; and (3) neurological and psychiatric evaluations evincing organic brain damage resulting from head trauma that he suffered at age eight or nine. In this appeal, Earp seeks not the grant of his petition for relief, but remand for an evidentiary hearing on this claim.[12]

Although he presented his claim to the state court, Earp never received an evidentiary hearing. The district court denied Earp's motion for an evidentiary hearing and granted summary judgment in favor of the Warden on this claim, concluding that Earp failed to establish that counsel's performance was deficient and that he suffered prejudice thereby, because the evidence in aggravation was insurmountable.[13]

---

[12]Earp also raised this claim in his state petition for habeas relief. In support of his claims at the state level Earp included the following items in his exhibits: the declaration of Lori Thomson, Earp's sister; Earp's CYA records; Earp's juvenile arrest/detention record; Earp's Santa Clara Valley Medical Center records; Earp's school records including progress reports, psychological reports, and testing results; Earp's Probation Officer's Social Study Report; birth, school, and medical records of Earp's extended and immediate family members; and various reports about the conditions of CYA confinement.

[13]The district court had before it all of the evidence contained in the state record, along with the following: the declaration of Barbara Nusbaum, Earp's aunt; the declaration of Helen Perusse, Earp's mother; the declaration of Curtis Earp, Earp's brother; Background Factors and Social History (prepared by defense investigator Sheryl Duvall for the trial court on January 23, 1992); the declaration of Douglas Dorman (re: teenage drug use, family background, time in detention); the declaration of Donald Robbins (re: family background, alcoholism, abuse, teenage drug use, time in detention); the declaration of Kelly Williams (re: teenage drug use, family background); the supplemental declaration of Barbara Nusbaum (re: alcohol abuse, family background, teenage drug use); the supplemental declaration of Curtis Earp (re: family background, father's abuse of Earp, father's suicide); the declaration of Abbey Drew (re: experience as Earp's Juvenile Hall counselor, Earp's behavior, impressions of Earp as a teenager); the declaration of Dean R. Gits (re: contents of the deposition of Sue Brown); the Expert Report of Ines Monguio, Ph.D. (re: whether

Earp has alleged facts that, if proven true, may entitle him to relief. Because an evidentiary hearing is needed in order to resolve these factual allegations we hold that the state court's decision was based on an unreasonable determination of the facts. For those reasons, Earp is entitled to an evidentiary hearing in federal court and we remand for that purpose.

## A

**[8]** In order to establish entitlement to an evidentiary hearing, Earp is not required to conclusively establish in this appeal that counsel was prejudicially deficient. Rather, Earp must demonstrate by his evidence the potential of a *colorable claim* that, if proven true at the hearing, would show that his former counsel's failure to investigate amounted to ineffective assistance of counsel, and that, but for such deficient representation, there is a reasonable probability that the outcome of the proceeding would have been different. *See Strickland v. Washington*, 466 U.S. 668, 688, 693-94 (1984).

## B

A defendant in a criminal proceeding is entitled to effective assistance of counsel in order "to protect the fundamental right to a fair trial." *Id.* at 684. *Strickland* sets forth two prongs that the defendant must satisfy in order to establish a Sixth Amendment right to counsel violation: (1) "the defendant must show that counsel's performance was deficient"; and (2) "the defendant must show that the deficient performance prejudiced the defense . . . . Unless a defendant makes both showings, it cannot be said that the conviction or death

Earp's psychosocial history and neuropsychological functioning prior to and during the crime for which he was convicted may have presented a viable defense at the time because Earp's test results and records were "consistent with organic damage[ ] by traumatic brain injury"); and the Expert Report of Ezekiel P. Perlo (re: expert opinion as to ineffective assistance, mostly addressing the conflict claim).

sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

In order to satisfy the first prong, "the defendant must show that counsel's representation fell below an objective standard of reasonableness" under "prevailing professional norms," *id.* at 688, by identifying the acts or omissions "that are alleged not to have been the result of reasonable professional judgment[,]" *id.* at 690. Our review of counsel's performance for constitutional deficiency "must be highly deferential" and should include every effort "to eliminate the distorting effects of hindsight[.]" *Id.* at 689.

It is not enough to show that counsel was deficient; rather, reversal is only proper if the error had a prejudicial effect on the outcome of the trial. *Id.* at 692. Thus, in order to establish prejudice, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

C

1

Two recent Supreme Court cases inform our analysis of Earp's claim. First, in *Williams v. Taylor*, 529 U.S. 362 (2000), where the defendant faced death because the jury found a probability of future dangerousness, the Supreme Court considered whether counsel's failure to discover, investigate, and present certain mitigating evidence fell "below the range expected of reasonable, professional competent assistance of counsel." *Id.* at 371 (internal quotation marks and citation omitted). At sentencing, counsel presented testimony from Williams's mother and two neighbors, and a taped excerpt from a psychiatrist. *Id.* at 369. The witnesses testified generally that Williams was a "nice boy," and a non-violent

person by nature. *Id.* The psychiatrist's taped excerpt related statements made by Williams that, in a prior unrelated robbery, Williams had removed the bullets from his gun in order to ensure that he did not hurt anyone. *Id.*

Reversing the Fourth Circuit's denial of habeas relief, the Supreme Court held that, notwithstanding the presentation of some mitigation evidence, "trial counsel did not fulfill their obligation to conduct a thorough investigation of [Williams's] background." *Id.* at 396 (citation omitted). Specifically, the Court noted that, despite being put on notice of Williams's cooperation in a prison sting, counsel requested neither prison records nor testimony from prison officials regarding Williams's non-violent disposition. *Id.* Counsel also failed to return a phone call from a witness who offered to testify on Williams's behalf. *Id.*

**[9]** *Wiggins v. Smith*, 539 U.S. 510 (2003), is also particularly instructive in the instant appeal. There, the Supreme Court further refined and emboldened the ineffective assistance inquiry in the context of a claimed failure to investigate mitigation evidence. The Court held that, in determining whether counsel exercised "reasonable professional judgment[,]" *Strickland*, 466 U.S. at 691, the focus is "on whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background *was itself reasonable*[,]" not "whether counsel should have presented" mitigation evidence, *Wiggins*, 539 U.S. at 522-23.

The Court ultimately granted Wiggins's "claim stem[ming] from counsel's decision to limit the scope of their investigation into potential mitigating evidence." *Id.* at 521. Defense counsel's mitigation investigation had been limited to two items: (1) a written presentence investigation ("PSI") report containing a one-page account of Wiggins's personal history noting "misery as a youth"; and (2) Baltimore Department of Social Services ("DSS") records documenting Wiggins's placements in the foster care system. *Id.* at 523-24. The Court

concluded that "[c]ounsel's decision not to expand their investigation beyond the PSI and the DSS records fell short of the professional standards that prevailed in Maryland in 1989" because "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Id.* at 524. The Court noted that "[c]ounsel's conduct [ ] fell short of the standards for capital defense work articulated by the American Bar Association (ABA) — standards to which [the Court] long [has] referred as guides to determining what is reasonable." *Id.* (internal quotation marks and citations omitted). The relevant ABA guidelines state that counsel in capital cases should consider the following information about a petitioner: medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences. *Id.* (citing ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases § 11.8.6, p. 133).

In addition to finding that the investigation should have been more expansive and probing as a general matter, the *Wiggins* Court further found that the investigation was "unreasonable in light of what counsel actually discovered" in the course of their limited investigation. *Id.* at 525; *see also Stankewitz*, 365 F.3d at 722. Specifically, the Court found that the DSS report should have tipped off counsel and triggered more robust investigation because it mentioned that Wiggins's mother was an alcoholic, that Wiggins and his siblings went without food, that Wiggins suffered emotional trouble, and that Wiggins experienced trouble in school. *Wiggins*, 539 U.S. at 524. In light of this information, the Court found that counsel uncovered no evidence in the course of the investigation that would indicate that "further investigation would have been fruitless." *Id.*

The Supreme Court has conveyed a clear, and repeated, message about counsel's sacrosanct duty to conduct a full and

complete mitigation investigation before making tactical decisions, even in cases involving similarly egregious circumstances. Based on this mandate, we hold that the district court abused its discretion in denying Earp's request for an evidentiary hearing and remand for such a hearing. At the proceeding, the Warden will have the opportunity to challenge Earp's allegations and the evidence rallied to support his claim. Earp will also have the opportunity to further substantiate his allegations. In other words, Earp must be given a full and fair hearing on his ineffective assistance of counsel claim.

**[10]** Although counsel clearly has a duty to conduct a full and complete mitigation investigation, we find it difficult to know where a habeas court may draw the line in deciding how far defense counsel must go in conducting the mitigation investigation for the penalty phase of a capital case. We think the jurisprudential principle to be gleaned from *Wiggins* is that, although counsel is not required "to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing[,]" *id.* at 533, they are in no position to decide, as a tactical matter, not to present mitigating evidence or not to investigate further just because they have *some* information about their client's background, *id.* at 527. Moreover, *Wiggins* also establishes that the presence of certain elements in a capital defendant's background, such as a family history of alcoholism, abuse, and emotional problems, triggers a duty to conduct further inquiry before choosing to cease investigating. *Id.* at 525. How far they must go is obviously heavily fact-dependent and cannot be ascertained here without developing a more complete evidentiary record on remand.

2

**[11]** Earp's claim invokes the essential issue in *Wiggins*: whether counsel's decision, based on a limited amount of information, to cease further investigation into mitigating evidence deprived Earp of his constitutional right to effective

assistance of counsel. As stated in *Wiggins*, the issue in Earp's case is not whether Dell should have presented certain mitigation evidence during the penalty phase, but whether she should have investigated further before deciding to cease investigating. "[W]e focus on whether the investigation supporting counsel's decision . . . *was itself reasonable*." *Id*. at 523. We conclude that an evidentiary hearing is required because Earp's allegations are sufficient to trigger the need for a hearing on whether Dell's investigation was unreasonable in light of the evidence she uncovered.

During the penalty phase, attorney Dell's mitigation presentation consisted of testimony from five witnesses. Earp's aunt and mother testified about his family background and childhood: his father's alcoholism, physical abuse of Earp's mother, and emotional abuse of Earp and his siblings; his stepfather's alcoholism, violence, and abuse of Earp, his mother, and his siblings; Earp's father's suicide and its effect on Earp; and Earp's juvenile history, including time spent in juvenile detention. *Earp*, 978 P.2d at 30-31. Gloria Hall, a juvenile facility cook from Earp's time in CYA detention, opined that Earp committed crimes as a juvenile because of his family situation, and stated that Earp "was awarded honor status" at the facility. *Id*. at 30. Virginia MacNair testified that she and Earp's son visited him in jail, and that Earp sent them letters and pictures. *Id*. James Park, the former associate warden at San Quentin, testified that he thought Earp "would pose no danger in a high security prison" and that he would adjust well to confinement. *Id*. Although Dell presented this mitigation evidence, Earp contends that her investigation was still insufficient in light of the evidence she uncovered.

Earp claims that his penalty phase presentation would have "materially benefitted" from evidence and testimony about his violent family and social background, substance abuse, mental illness, history of emotional problems, and brain injury. *See Stankewitz*, 365 F.3d at 721-22 (finding that petitioner's penalty phase representation would have benefitted from

information about the petitioner's background, history of mental illness, and substance abuse problems). In his motion for an evidentiary hearing on this claim, Earp stated that he would present: (1) testimony of counsel as to her failure to obtain and present family and personal background; (2) evidence as to family and personal history obtained by habeas counsel, including records of emotional problems and possible psychological and neurological problems stemming from early childhood, medical evaluations evincing organic brain damage which may have exacerbated Earp's behavioral problems, as well as testimony from family and friends regarding Earp's ongoing substance abuse; and (3) expert testimony regarding prejudice.

In support of his claim, Earp presented the district court with: declarations from family members providing additional details about his background; declarations from family members, associates, and a CYA counselor discussing his history of substance abuse; declarations regarding Earp's time spent in CYA custody; an expert report finding that Earp's psychosocial history and neuropsychological functioning prior to, during, and after commission of the crime may have presented a viable defense because Earp's test results and records were "consistent with organic damage[ ] [caused] by traumatic brain injury"; and an expert report as to counsel's failure to render effective representation.

If true, the facts alleged may well paint a materially different picture of Earp's background and culpability, the very things considered relevant and vital to a competent mitigation presentation. *See, e.g.*, *Douglas v. Woodford*, 316 F.3d 1079, 1090 (9th Cir. 2003). First, the declarations set forth a more detailed view of Earp's family background. For instance, the declarations allege details of Earp's father's (Don Earp) alcoholic binges, sometimes leading to police dispatches and often resulting in serious beatings of Earp's mother.[14] They also

---

[14]Some of the declarations state that Earp and his siblings were occasionally beaten during these binges as well.

outline Don Earp's slide from alcoholism into suicide after being severely beaten himself, discussing how his violence toward the family and "uncontrollable rages" intensified. The declarations also set forth an account of Ricky Earp's life after his father's suicide spent in the company of a similarly abusive and alcoholic stepfather in a house where "finances, and indeed even food and shelter were inconsistent." The declarations detail the trauma that his father's suicide caused Earp. *See id.* at 1087-89 (finding deficient counsel due, in part, to failure to investigate and present additional evidence of petitioner's family background and "difficult childhood"); *see also Wiggins*, 539 U.S. at 525 (finding ineffective assistance for failure to investigate petitioner's background involving abuse, alcoholism, neglect, and emotional trouble).

Second, the declarations from friends and family outline a history of substance abuse that the state court did not address and that the district court found to be unimportant. The declarations state that Earp's drug abuse began with smoking marijuana when he was twelve or thirteen years old, and that he later used other illegal drugs on a regular basis, including methamphetamine, cannabinol, LSD, and other hallucinogenics. The declarants also note that Earp consumed large quantities of alcohol during his teen years, sometimes selling marijuana to adults in exchange for the purchase of alcohol. *See Lambright v. Stewart*, 241 F.3d 1201, 1207 (9th Cir. 2001) (determining that counsel's failure to obtain a psychiatric evaluation of the petitioner where he had a history of "extensive drug abuse," among other things, constituted deficient performance and warranted remand for an evidentiary hearing).

Finally, the declarations, records, and reports regarding Earp's emotional and neurological history allege additional mitigation grounds. Earp's school records, including progress reports, psychological evaluations, and testing results, contain details that should have caused counsel to investigate further. Specifically, a psychological report conducted after repeated

behavioral problems stated that Earp "should be considered for at least partial Educationally Handicapped placement" and that "[s]uch placement would be on an emotional disturbance basis." The report goes on to note that "[a]lternate ways to deal with disturbing behavior and emotionally charged feelings should be explored, as well as the desirability of outside agency counseling." The report also discusses Earp's test results and observations, finding that Earp was "very troubled," suffered from "a great deal of anxiety," and was "having trouble coping emotionally."

The testing and observations also revealed a "lack of adequate control." A later report, documenting a psychiatrist-parent conference regarding Earp's "obvious emotional disturbance," also dealt with Earp's trauma resulting from his father's suicide.[15] Earp alleges that these problems continued, as evidenced by a CYA intake report noting that Earp "has experienced psychosocial turmoil" and "witnessed alcoholism, physical brutality, domination, inconsistent discipline, and marital discord followed by divorce and a broken home." *See Ainsworth v. Woodford*, 268 F.3d 868, 875-76 (9th Cir. 2001) (finding ineffective assistance where counsel failed to investigate and present mitigation evidence regarding, *inter alia*, petitioner's history of emotional problems dating back to childhood).

Earp asserts that the emotional problems that he alleges to have suffered throughout his youth and into adulthood were exacerbated and augmented by a head injury that he suffered in a motorcycle accident at age eight or nine, resulting in organic brain damage. Expert Dr. Ines Monguio conducted neuropsychological testing of Earp, finding that his functioning is "consistent with the presence of organic damage." Monguio also determined that discrepancies in Earp's verbal functions were consistent with brain damage. The expert con-

---

[15]A follow-up psychiatrist-parent conference report noted that "the situation has not improved" and had, in fact, possibly worsened.

cluded that Earp displayed the "consequences of the brain trauma" suffered in the motorcycle accident, as well as "generalized damage probably incurred through consistent and extreme" substance abuse. Monguio concluded that the testing results and background data were "consistent with organic damage[ ] [caused] by traumatic brain injury[,]" and noted that a "person diagnosed with this type of damage display[s], among other symptoms, impulsive behavior, problems with self-monitoring (regulating behavior), and poor judgment." *See Douglas*, 316 F.3d at 1086 (finding ineffective assistance of counsel for failure to investigate and present mitigation evidence where petitioner suffered from "possible organic impairment" and test results revealed "some level of pre-existing neurological deficit") (internal quotation marks omitted).

3

**[12]** We hold that under *Williams* and *Wiggins* Earp has met his burden of showing a colorable claim sufficient to trigger entitlement to an evidentiary hearing. He has adequately alleged that counsel unreasonably curtailed investigation into mitigating evidence, even after being presented with information warranting and triggering a duty to look further. In her declaration, attorney Dell stated the following: that she did not present any evidence that "was not entirely consistent with [Earp's] claim of innocence"; that her main penalty phase theme was "lingering doubt"; that she was solely responsible for the investigation and preparation of Earp's penalty phase presentation; that she obtained the services of, and relied on completely, defense investigator Sheryl Duvall; that she did not direct Duvall's investigation or instruct her to investigate specific areas; that the defense investigator obtained Earp's school and medical records; that Dell did not collect, or instruct to be collected, evidence concerning the conditions of confinement in the CYA at the time of Earp's detention; and finally, that she knew of Earp's head injury and

history of substance abuse, but did not seek a neurological or mental health evaluation.[16]

The district court determined, and the Warden now argues, that counsel's mitigation case represented a tactical decision entitled to deference. However, deference is only owed to strategic decisions reached after "thorough investigation of law and facts relevant to plausible options[.]" *Strickland*, 466 U.S. at 690. We do not see how such a conclusion may be made on this record without a factual hearing. Earp alleges that his counsel failed to obtain a mental health, neurological, or psychological evaluation of Earp, despite being alerted to the following evidence about Earp's background: (1) that he had both a personal and a family history of substance abuse; (2) that his family had a history of alcoholism, mental illness, suicide, and physical and emotional abuse; (3) that Earp's father and stepfather were abusive; (4) that Earp's mother was physically abused; (5) that Earp had a history of emotional problems; and (6) that Earp had suffered a head injury.

**[13]** If proven to be true during future evidentiary hearings, this alleged history of substance abuse, emotional problems, and organic brain damage is the very sort of mitigating evidence that "might well have influenced the jury's appraisal of [Earp's] moral culpability." *Williams*, 529 U.S. at 398; *see also Douglas*, 316 F.3d at 1090 ("Evidence regarding social background and mental health is significant, as there is a 'belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background or to emotional or mental problems, may be less culpable than defendants who have no such excuse.' ") (quoting *Boyde v. California*, 494 U.S. 370, 382 (1990)); *Allen v. Woodford*, 395 F.3d 979, 1000 (9th Cir. 2005) ("Defense counsel's use of mitigation evidence to complete, deepen, or

---

[16]Whether her proffered evidence will withstand the crucible of an adversary proceeding and cross-examination for possible bias remains to be seen.

contextualize the picture of the defendant presented by the prosecution can be crucial to persuading jurors that the life of a capital defendant is worth saving.") (citations omitted).

If proven, Earp's allegations could establish a colorable claim that counsel's failure to investigate mitigating evidence, "despite tantalizing indications in the record, as in *Wiggins*, that would lead a reasonable attorney to investigate further," deprived Earp of his constitutionally guaranteed right to effective representation. *Stankewitz*, 365 F.3d at 720 (internal quotation marks and citation omitted). We emphasize that the ultimate determination must be made in the first instance by the fact-finder at the hearing. We offer no opinion on the merits of Earp's claim here.

4

But even if Earp has established a colorable claim of ineffective assistance for failure to conduct a competent mitigation investigation, he must also present a colorable claim that counsel's deficient performance prejudiced him. *Wiggins*, 539 U.S. at 521; *see also Stankewitz*, 365 F.3d at 722-23. "In assessing prejudice, [the court] reweigh[s] the evidence in aggravation against the *totality of available* mitigating evidence." *Stankewitz*, 365 F.3d at 723 (emphasis added) (quoting *Wiggins*, 539 U.S. at 534). The totality of the available evidence includes "both that adduced at trial, *and the evidence adduced in the habeas proceeding[s].*" *Wiggins*, 539 U.S. at 536 (quoting *Williams*, 529 U.S. at 397-98).

Earp has alleged that the testimony presented at the penalty phase did not fully encompass the degree of violence, abuse, and alcoholism that he claims to have suffered during his formative years. It appears that the jury in this case was not presented with the evidence that Earp alleges regarding his history of substance abuse beginning at age twelve, his organic brain damage and its attendant effects resulting from his childhood head injury at age eight or nine, or his history

of emotional problems. While Earp's life history is not as "excruciating" as that of defendants in other cases, it may well be that, after conducting the hearing on remand, the habeas court could conclude that, "[h]ad the jury been able to place [Earp's] life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537 (noting, further, that Wiggins did "not have a record of violent conduct" that the prosecution could have introduced to offset the omitted mitigating evidence).

During the prosecution's penalty phase of the trial, the aggravation presentation consisted of Earp's prior felony conviction for burglary. *Earp*, 978 P.2d at 30; *see also Mayfield v. Woodford*, 270 F.3d 915, 933 (Gould, J., concurring) (noting that, for purposes of prejudice, it is relevant to consider that the defendant did not have "an extensive history involving major crimes or violence"). In finding no prejudice, the district court determined that any omitted mitigation evidence would not have made a difference to even a single reasonable juror because the nature of Earp's crime was so egregious.

The aggravating circumstances of this case are indeed heinous. However, as we have previously noted, "the Supreme Court has made clear that counsel's failure to present mitigating evidence can be prejudicial even when the defendant's actions are egregious." *Stankewitz*, 365 F.3d at 723-24 (discussing *Williams*, 529 U.S. at 368, 398-99 (noting that, among his other crimes, Williams confessed to "brutally assault[ing] an elderly woman leaving her in a vegetative state" in her home, yet still finding that the mitigating evidence that counsel failed to investigate could have tipped the balance for at least one juror) (internal quotation marks omitted)); *see also Mak v. Blodgett*, 970 F.2d 614, 620-22 (9th Cir. 1992) (finding prejudice despite the presence of exceedingly horrific circumstances of the crime in which the defendant slaughtered thirteen people in the course of one night to eliminate all witnesses to an armed robbery).

**[14]** Given that the circumstances of Earp's crime constituted the vast majority of the aggravation case, prejudice is "especially likely." *Lambright*, 241 F.3d at 1208 (noting that "[p]rejudice is especially likely where, as here, this is not a case in which a death sentence was inevitable because of the enormity of the aggravating circumstances") (internal quotation marks and citation omitted); *cf. Allen*, 395 F.3d at 1009 (finding no prejudice, despite ineffective assistance, because of the overwhelming evidence in aggravation consisting, in part, of a "long history of orchestrating and committing violent robberies and burglaries" and plotting the murder of multiple individuals who testified against the defendant on an earlier murder charge). Accordingly, we hold that Earp's allegations are sufficient to require an evidentiary hearing because, if true, they could establish that he suffered prejudice from counsel's deficient mitigation investigation and presentation.

V

Earp's second Sixth Amendment claim is that he was deprived of effective assistance of counsel because his intimate relationship with Dell created a conflict of interest between Dell's duties as counsel and her personal interests in the relationship. We affirm the denial of habeas relief on this claim because the state court finding of no conflict was neither contrary to, nor an unreasonable application of, clearly established federal law.

A

On April 23, 1991, Adrienne Dell was appointed as Earp's second counsel. Dell met frequently with Earp, giving him her home phone number and speaking with him regularly in order to build trust and rapport. During the course of her representation, Dell developed romantic feelings for Earp.

The conversations between Earp and Dell reflected this sentiment and started to broach more personal matters,

although only after discussing necessary case-related issues. Dell sent Earp pictures of herself and dressed provocatively for her visits to Earp. She also disrobed for him and engaged in "intimate relations" with Earp during their visits. In addition, Dell gave him a religious medallion "to signify her feelings for him," picking this type of item because she knew that the rules of confinement would allow for him to keep it, given its religious nature. During the trial itself, Earp and Dell passed personal notes and winked to each other.

After the return of the guilty verdict, Dell confessed her love to Earp in the holding cell and he reciprocated. From then on, Dell and Earp shared a "strong emotional attachment," which culminated in their marriage after Earp was transferred to death row. Dell and Earp were married from October 7, 1993, until December 27, 2000.

This issue was first raised in Earp's state petition for writ of habeas corpus and was summarily denied on the merits. Earp reiterated this claim in his federal habeas petition. The defense argued that, because of the relationship between Dell and Earp, Dell: (1) failed to present any shaken baby syndrome evidence; (2) gave Earp too much control over his defense; and (3) failed to present substantial mitigation evidence of which she was aware. The district court held an evidentiary hearing on the conflict claim and bifurcated the inquiry, instructing counsel to only present evidence of "actual conflict," and barring the defense from presenting any evidence relating to whether the representation was adversely affected by the alleged conflict.[17]

---

[17]Earp also argues that the district court's bifurcation of the evidentiary hearing was improper because actual conflict cannot be determined without analyzing whether there was an adverse effect on representation. While the Supreme Court in *Mickens v. Taylor*, 535 U.S. 162, 171-73 (2002), makes clear that the question of actual conflict is not properly analyzed as two separate inquiries, we affirm the district court's denial of the claim on summary judgment because, even assuming the facts alleged to be true, the state court decision did not contravene Supreme Court precedent. *See* supra, § V.C; *see also Lambert*, 393 F.3d at 965 (noting that this court can affirm the district court decision on any ground supported by the record).

At the close of the evidentiary hearing, the district court propounded that "[b]eing in love is not a conflict," and concluded that Dell felt she was acting in Earp's best interest. In its order denying relief on the conflict claim, the district court compared Dell's situation to every lawyer's conflict between maintaining a personal life and a professional life: "such balancing is done by every lawyer who works past the time their spouse goes home or school lets out." The district court ultimately concluded that, because there was no actual conflict, it was unnecessary to examine whether there was any adverse impact due to purported conflict.

On appeal, Earp argues that Dell labored under an actual conflict, relying primarily on our circuit's case law addressing situations where a lawyer's personal interests conflict with the defendant's interest,[18] as well as various state supreme court disciplinary proceedings stemming from unethical lawyer-client sexual relationships.[19] Most of these cases involve pre-AEDPA petitions, many of which do not involve habeas proceedings, and all of which were decided before the Supreme Court issued *Mickens v. Taylor*, 535 U.S. 162, 166 (2002). For the reasons explained below, we hold that Earp's claim fails, and that the district court properly denied this claim for relief.

### B

Whether counsel and client had conflicting interests is a mixed question of law and fact which we review de novo. *Williams*, 384 F.3d at 586; *see also Bragg v. Galaza*, 242 F.3d 1082, 1086, *amended by* 253 F.3d 1150 (9th Cir. 2001). We also review de novo the district court's summary judgment decision. *Davis*, 384 F.3d at 638. Section 2254(d)(1) of

---

[18]*E.g.*, *United States v. Hearst*, 638 F.2d 1190 (9th Cir. 1980); *United States v. Baker*, 256 F.3d 855 (9th Cir. 2001).

[19]*E.g.*, *In re Gore*, 752 So.2d 853 (La. 2000); *In re Grimm*, 674 N.E.2d 551 (Ind. 1996); *People v. Boyer*, 934 P.2d 1361 (Colo. 1997).

U.S.C. Title 28 applies to questions of law and mixed questions of law and fact. *Id.* at 637. A decision is "contrary to" federal law when the state court applies a rule of law different from that set forth in the holdings of Supreme Court precedent or when the state court makes a contrary determination on "materially indistinguishable" facts. *Williams*, 529 U.S. at 405-06. An "unreasonable application" of federal law occurs when a state court's application of Supreme Court precedent to the facts of a petitioner's case is "objectively unreasonable." *Id.* at 409. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 411.

Clearly established federal law "as determined by the Supreme Court," § 2254(d)(1), " 'refers to the holdings, as opposed to the dicta of [the Supreme Court's] decisions as of the time of the relevant state-court decision.' " *Lambert*, 393 F.3d at 974 (quoting *Lockyer*, 538 U.S. at 71-72). Circuit court precedent is relevant only to the extent that it clarifies what constitutes clearly established law. *Casey v. Moore*, 386 F.3d 896, 907 (9th Cir. 2004); *see also Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003), *cert. denied*, 540 U.S. 968 (2003); *Duhaime v. Ducharme*, 200 F.3d 597, 602-03 (9th Cir. 2000) (Ninth Circuit precedent derived from an extension of a Supreme Court decision is not "clearly established federal law as determined by the Supreme Court").

## C

**[15]** While ineffective assistance of counsel claims generally require the petitioner to show deficient representation and prejudice, we "forgo individual inquiry into whether counsel's inadequate performance undermined the reliability of the verdict" in instances "where assistance of counsel has been denied entirely or during a critical stage of the proceeding." *Mickens*, 535 U.S. at 166. Circumstances of such magnitude may "arise when the defendant's attorney actively represented

conflicting interests." *Id*. at 166; *see also Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). In order to establish a Sixth Amendment violation under the *Sullivan* exception, the defendant must demonstrate that "an actual conflict of interest adversely affected his lawyer's performance." *Sullivan*, 446 U.S. at 348. As clarified in *Mickens*, an actual conflict is not "something separate and apart from adverse effect." 535 U.S. at 172 n.5. Rather, "[a]n 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." *Id*.

The Supreme Court's recent decision in *Mickens* proves determinative in the instant appeal. In *Mickens*, the Supreme Court dealt with a habeas claim in a capital case alleging ineffective assistance where counsel for the defendant also represented the victim, who was a defendant in an unrelated juvenile case. *Id.* at 164-65. After being informed that the victim was deceased, the trial judge dismissed the juvenile charges against him. *Id*. The same trial judge appointed counsel in the defendant's case. *Id*. at 165. The precise issue facing the Court was "what a defendant must show in order to demonstrate a Sixth Amendment violation where the trial court fails to inquire into a potential conflict of interest about which it knew or reasonably should have known." *Id*. at 164.

In answering this query, the *Mickens* Court clarified its conflict precedent and restated the parameters of its application. First, the Court discussed three seminal Supreme Court conflict cases: *Holloway v. Arkansas*, 435 U.S. 475 (1978);[20]

---

[20]In *Holloway*, defense counsel representing three codefendants with diverging and potentially conflicting interests moved for the appointment of separate counsel. 435 U.S. at 478-80. The Supreme Court noted that counsel in this situation is effectively gagged from properly representing any one of the defendants, and that it is inherently difficult to measure the degree of harm caused by such conflicts. *Id*. at 489-90. The Court found that this type of conflict undermines the fairness and efficacy of the adversarial process, and that automatic reversal was necessary where defense counsel's objection was denied by the trial court, unless the trial court concludes that there is no conflict. *Id*. at 488.

*Sullivan*, 446 U.S. at 346-49;[21] and *Wood v. Georgia*, 450 U.S. 261 (1981).[22]

After surveying precedent, the *Mickens* Court added an entire section to address the limited scope of its holding, and to explicitly cabin its conflict jurisprudence despite its expansive application by lower courts. 535 U.S. at 174-76. The Court noted that circuit courts "have applied *Sullivan* 'unblinkingly' to 'all kinds of alleged attorney ethical conflicts,' " invoking it in cases involving interests of former clients, interests implicating counsel's personal or financial interest, interests inherent in romantic relationships with opposing counsel, and interests implicated by counsel's future or present employment with opposing counsel. *Id.* at 174 (citation omitted).[23] While acknowledging this expansion, the

---

[21]In *Sullivan*, the Supreme Court addressed the issue of multiple representation where the trial court does not and reasonably should not know of the conflict. 446 U.S. at 345-50. The *Sullivan* Court noted that *Holloway* recognized that "a lawyer forced to represent codefendants whose interests conflict cannot provide the adequate legal assistance required by the Sixth Amendment." *Id.* at 345 (citing *Holloway*, 435 U.S. at 481-82). The *Sullivan* Court further developed the joint representation conflict standard, stating that, "[i]n order to establish a violation of the Sixth Amendment, a defendant who raises no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance" and that a defendant who makes such a showing is not required to show prejudice in order to obtain relief. *Id.* at 348, 349-50.

[22]In *Wood*, the Court remanded for proceedings to determine whether there was an actual conflict where the defendants' lawyer was being paid by the defendants' employer. 450 U.S. at 269-72 (employer owned a business purveying obscene material, and the defendants had been convicted in connection with the business). The defendants' employer had been paying the defendants' fines, imposed after their conviction for distributing obscenity. *Id.* at 276. The Court determined that remand was necessary because "petitioners were represented by their employer's lawyer, who may not have pursued their interests single-mindedly." *Id.* at 271-72.

[23]Earp argues that, despite *Mickens*, circuit courts have long applied the *Sullivan* conflict framework to a wide variety of conflicts in addition to the traditional concurrent representation application. *See, e.g., Mannhalt v.*

Court cautioned that its own conflict jurisprudence had not yet reached beyond joint representation: "the language of *Sullivan* itself does not clearly establish, or indeed even support, such expansive application . . . . Both *Sullivan* itself [ ] and *Holloway* [ ] stressed the high probability of prejudice arising from multiple concurrent representation, and the difficulty of proving that prejudice. Not all attorney conflicts present comparable difficulties." *Id*. at 175 (internal citations omitted). The Court propounded that the conflict inquiry does not, and should not, entail weighing of professional ethical duties, and that the *Sullivan* exception is not intended to enforce and encourage compliance with codes of conduct:

> This is not to suggest that one ethical duty is more or less important than another. The purpose of our *Holloway* and *Sullivan* exceptions from the ordinary requirements of *Strickland*, however, is not to enforce the Canons of Legal Ethics, but to apply needed prophylaxis in situations where *Strickland* itself is evidently inadequate to assure vindication of the defendant's Sixth Amendment right to counsel.

*Id*. at 176.

---

*Reed*, 847 F.2d 576, 580-81 (1988) (pre-AEDPA habeas case finding that *Sullivan* applies when an attorney is accused of similar crimes for which his client is being prosecuted); *Garcia v. Bunnell*, 33 F.3d 1193, 1196-98 (9th Cir. 1994) (pre-AEDPA habeas case finding that, although the "vast bulk of the caselaw in the attorney conflict area involves alleged conflicts arising out of representation of multiple defendants by a single attorney who may not be able simultaneously to serve optimally the interests of each," *Sullivan* also applies "to conflicts between a defendant's and the attorney's own personal interests"); *see also Winkler v. Keane*, 7 F.3d 304, 307 (2d Cir. 1993) (citing other sister circuit cases expanding application of the *Sullivan* standard). This line of argument, however, is futile post-AEDPA; only Supreme Court holdings are binding on state courts. *See Lambert*, 393 F.3d at 974 ("only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied") (quoting *Clark v. Murphy*, 331 F.3d 1062, 1069 (2003)).

**[16]** The *Mickens* Court specifically and explicitly con-
cluded that *Sullivan* was limited to joint representation, and
that any extension of *Sullivan* outside of the joint representa-
tion context remained, "as far as the jurisprudence of [the
Supreme Court was] concerned, an open question." *Id.*

D

**[17]** The Supreme Court has never held that the *Sullivan*
exception applies to conflicts stemming from intimate rela-
tions with clients. *See Lambert*, 393 F.3d at 986 (noting that
Supreme Court precedent is limited to conflicts involving
joint representation); *see also Smith v. Hofbauer*, 312 F.3d
809, 815-17 (6th Cir. 2002) (finding that the *Sullivan* line of
Supreme Court precedent only apply, for AEDPA purposes,
to cases involving joint representation; noting that "[b]ecause
the question of whether the *Sullivan's* lessened standard of
proof for a claim of ineffective assistance of counsel based
upon an attorney's conflict of interest for anything other than
joint representation remains an 'open question' in the juris-
prudence of the Supreme Court, and in fact was an open ques-
tion at the time Petitioner's case was heard, Petitioner's claim
fails because it is not based upon clearly established Supreme
Court precedent as mandated by AEDPA") (internal citation
omitted).

E

**[18]** While our circuit's precedent has expanded the scope
of the *Sullivan* exception to apply in other contexts, and while
we strongly disapprove of Adrienne Dell's unprofessional
behavior as reflected in her conduct at bar, the advent of
AEDPA forecloses the option of reversing a state court deter-
mination simply because it conflicts with established circuit
law. Although we would perhaps reach a different conclusion
if addressing this claim on direct review, the Supreme Court
has not spoken to this issue and has expressly limited its con-
stitutional conflicts jurisprudence. Accordingly, we hold that

the state court's determination that the intimate relationship between Earp and his counsel during the trial and sentencing did not constitute a conflict of interest was neither contrary to, nor an unreasonable application of, established federal law.

## VI

Earp is entitled to an evidentiary hearing on his prosecutorial misconduct claim involving Michael Taylor because he has alleged facts which, if proven true, may entitle him to relief on this claim. Earp is also entitled to an evidentiary hearing on his ineffective assistance of counsel claim because he has demonstrated a colorable claim that counsel's mitigation investigation was deficient in light of the evidence uncovered, and that he suffered prejudice thereby. We therefore vacate the district court's summary judgment on these claims and remand for an evidentiary hearing. The district court's decision to deny Earp's conflict of interest claim was neither contrary to, nor an unreasonable application of, clearly established federal law, so we affirm that part of the district court's summary judgment.

**AFFIRMED in part, REVERSED in part, and REMANDED for an evidentiary hearing.**