IKUTA, Circuit Judge,
dissenting in part and concurring in part:
I respectfully dissent from the majority’s disposition of petitioner Aryon Williams’s claim based on Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). While I concur in the result reached by the majority on Williams’s other two claims, I write separately to express my disagreement with the majority’s reasoning.
I
I agree with the majority that Williams’s Brady claim is not procedurally barred and that we may consider its merits. I disagree, however, with the majority’s decision to remand to the district court for an in-court evidentiary hearing. Instead, I would hold that the prosecution’s suppression of the letters written by Beverly Sweat rose to the level of a Brady violation with respect to the penalty phase of Williams’s capital case, but not with respect to the guilt phase. Accordingly, I would uphold the district court’s denial of the habeas writ as to Williams’s conviction, but grant the writ as to his sentence.
A
Five years after Williams was convicted and sentenced to death for the murder of Rita DeLao, the prosecution turned over to the defense a series of jailhouse letters offering to provide information about the DeLao murder in exchange for early release from jail. The letters had been received by the government six years earlier, before Williams’s trial had begun, and were written by a woman named Beverly Sweat. They were addressed to Detective Tom Solis, the lead investigator in DeLao’s murder.
In the letters, Sweat identified two individuals with information about DeLao’s murder, Yolanda McKaney, a fellow jail-mate of Sweat, and Milton Barnett. The letters also identified an additional perpetrator in the commission of the murder, Patrick Fields, and an alternate theory of the crime, namely that Williams had paid Fields to commit the murder on his behalf. Relevant here, the letters stated:
Try questioning Milton Barnett Jr. [Yolanda McKaney] mention his name too so may he knows something last WED, we went to the yard and me and Yolanda [McKaney] was talking to [Williams] an he said there was two people he was going to get one from Eloy -» Patrick Fields one from Casa Grande Milton Barnette [Williams] kept asking question about Milton so check it out.
I went ahead an talk to Yolanda [McKaney] an she told me the what happen the night Rita [DeLao] good killed, she said she was walking down trekelle Road in Casa Grande an ran into Patrick [Fields] he was all bloody an she ask him why was he all bloody an he told her he had just killed Rita [DeLao] an [Williams] had paid him 1000 for doing it he had a knife on him, an said he used it to cut her eyes out also used a mopad to run over her an her an Patrick burned up the cloths he had on an the went an spent the money which took about two or three days. I think you should talk to her about this I know [Williams] is *1273 guilty of some part of it but I wish you would get me out of here before you bring it to surface....
Patrick Fields was a mentally unstable person who, at the time of DeLao’s murder, had an extensive criminal history with charges including burglary, aggravated assault, and sexual assault. Fields was also responsible for a series of attacks against women in the months after DeLao’s murder, in the same area where DeLao was killed.
Based on the government’s withholding of these letters, Williams attempted to raise a Brady claim in a state postconviction petition. The state post-conviction court did not reach the merits of this claim, however, because it held that the claim was procedurally barred. Williams had asked for an extension of time to file the petition under Arizona Rule of Criminal Procedure 32.4(c)(1), which permits the state court to grant a defendant a sixty-day extension in which to file a successive post-conviction petition “[o]n a showing of good cause.” The state court determined that there was no good cause for the extension and, as such, denied Williams’s request.
Presenting the Brady issue to the district court, Williams moved for an evidentiary hearing to explore the scope of the prosecutor’s potential wrongdoing. The district court granted the request, but determined that, “[i]n light of the narrow focus” of the Brady claim and “because [Williams’s] motion d[id] not ... indicate why particular evidence requires oral presentation,” it would conduct the hearing “through receipt of written evidence” rather than through live testimony. The government contested this ruling, arguing that an in-court hearing was necessary to permit cross-examination of Williams’s witnesses. Williams responded that an in-court hearing was not warranted because the government had been given sufficient time to investigate the claim through discovery. The district court ultimately declined the government’s request to conduct the hearing in person.
Reviewing the Brady issue on the merits, the district court focused its analysis on the declarations of McKaney and Barnett, which Williams’s counsel had collected in the course of an investigation into the Brady issue after the government’s disclosure of the Sweat letters, years after Williams’s conviction and sentencing. McKaney’s declaration reported that she had witnessed Fields burning a bloody shirt in an alley dumpster around the time of DeLao’s death. Similarly, Barnett’s declaration reported that he had seen Fields, covered in blood, dispose of something in an alley dumpster the day before he heard DeLao had been killed.
Ultimately, the district court concluded that the information regarding Patrick Fields was not material under Brady because it neither impeached Michelle Deloney’s testimony that Williams had confessed to the crime nor “exculpate[d] [Williams]; rather it affirm[ed Williams’s] involvement in the murder.” The district court noted that McKaney and Barnett would be subject to “adversarial testing” in the event of a new trial because their declarations were inconsistent, both with each other and with the Sweat letters. In addition, the district court observed that the Sweat letters erroneously described the manner in which DeLao was killed, and that the credibility of Sweat and McKaney was subject to question because of the nature of their jailhouse discussions. Based on its holding that Williams had failed to satisfy Brady’s materiality prong, the district court denied habeas relief.
B
As explained by the majority, the state court’s denial of Williams’s request for an *1274 extension under Arizona Rule of Criminal Procedure 32.4(c)(1), which had the effect of barring consideration of Williams’s claim on procedural grounds, was not a “firmly established and regularly followed state practice” in the capital context, Ford v. Georgia, 498 U.S. 411, 423-24, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991) (internal quotation marks omitted), and therefore the state court’s ruling was inadequate to bar habeas relief. Because Williams’s claim was not “adjudicated on the merits,” 28 U.S.C. § 2254(d)(1), there is “no state court decision on this issue to which to accord deference,” and I agree with the majority that our review of this claim is de novo. See Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir.2002) (“[Wjhen it is clear that a state court has not reached the merits of a properly raised issue, we must review it de novo.”).
“[Wjhen the State withholds from a criminal defendant evidence that is material to his guilt or punishment, it violates his right to due process of law in violation of the Fourteenth Amendment.” Cone v. Bell, — U.S. -, 129 S.Ct. 1769, 1782, 173 L.Ed.2d 701 (2009). As the majority states, “[tjhere are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.” Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). Stated otherwise, a Brady violation results when the prosecution suppresses evidence that is “material,” that is, when “there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.” Id. at 280, 119 S.Ct. 1936. Under this standard, reversal of a conviction or sentence is required upon a “showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.” Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Here, there is no dispute that the government suppressed the Sweat letters; therefore, the court’s inquiry is confined to whether the suppressed letters are favorable to Williams and whether their suppression was prejudicial to the result of his proceeding.
Williams articulates a number of reasons why the Sweat letters are material. The letters identify by name an additional suspect in DeLao’s murder and two individuals with information about the crime. The perpetrator identified in the letters, Fields, was mentally ill and had an extensive criminal history. According to the letters, Fields confessed to McKaney that he committed the murder, and this confession occurred on the night the murder occurred, while Fields was still covered in blood.
Williams argues that, because he was convicted and sentenced on the basis of circumstantial evidence, there is a reasonable probability that the result of the proceeding would have been different had the letters been disclosed. First, Williams contends that disclosure of the letters would have enabled him to point to another person who committed the crime, thereby supporting his claim of innocence. Williams asserts that, had he known about Barnett and McKaney, he would have been able to call them to the stand and they would have testified regarding their knowledge of Fields’s participation in the crime. Williams claims he also could have introduced evidence that Fields was a likely suspect, based on his mental instability and history of committing criminal acts in the area.
*1275 Second, Williams theorizes that disclosure of the letters and the police’s failure to follow up with Sweat, McKaney, and Barnett would have furthered his trial theory that the police were negligent in their investigation of the crime. Like the defendant in Kyles, Williams argues that the information in the letters would have permitted “the defense [to] examine[ ] the police to good effect on their knowledge of [Fields’s] statements and so have attacked the reliability of the investigation in failing even to consider [Fields’s] possible guilt.” 514 U.S. at 446, 115 S.Ct. 1555.
Last, Williams contends that he could have used the information in the letters to impeach Michelle Deloney’s testimony that Williams confessed to committing the crime, because the version of events described by Deloney differed from that depicted in the letters.
Our recent en banc decision United, States v. Jemigan supports Williams’s argument that the information regarding Patrick Fields as an additional perpetrator was material to Williams’s defense. 492 F.3d 1050 (9th Cir.2007) (en banc). Jemigan also dealt with a situation where the prosecutor withheld information regarding another possible perpetrator of the crime for which the defendant was on trial. See id. at 1051. There, the defendant was charged with bank robbery based primarily on her physical likeness to eyewitnesses’ descriptions of the robber. Id. The prosecutor withheld evidence of an alternative suspect fitting the same physical description who had been arrested for robbing nearby banks after the defendant was already in custody. Id. at 1054-55. In reviewing whether the suppression of the existence of the alternative suspect constituted a Brady violation, we determined that the information was material and therefore that the defendant’s habeas writ should be granted. Id. at 1057.
Our holding in Jemigan was based on the principle that “[withholding knowledge of a second suspect conflicts with the Supreme Court’s directive that ‘the criminal trial, as distinct from the prosecutor’s private deliberations, be preserved as the chosen forum for ascertaining the truth about criminal accusations.’ ” Id. at 1056-57 (brackets omitted) (quoting Kyles, 514 U.S. at 440, 115 S.Ct. 1555). Jemigan indicates that credible information about a second suspect to a crime is generally material and therefore should be disclosed to the defendant.
Like the suppressed evidence in Jemigan, the Sweat letters provide information that credibly indicates the existence of a second suspect. The letters give a detailed description of specific, named individuals, at least one of whom was known to the informant, all of whom were part of the same community in a small town. At least one of the individuals identified in the letters, Yolanda McKaney, allegedly interacted with Patrick Fields near the time of the murder and reported that he was covered in blood and confessed to the crime. Moreover, the prosecutor would have known at the time of receiving these letters that Fields was a plausible suspect, based on then-recent incidents in which Fields had attacked other women in the area. Under Jemigan, these circumstances weigh in favor of the letters’ materiality.
For Williams to prevail on this claim, however, he must also prove that the letters are “favorable” to him, Strickler, 527 U.S. at 281, 119 S.Ct. 1936, either because they are exculpatory or because they have impeachment value. See id. at 281-82, 119 S.Ct. 1936. On this point, Williams’s case and Jemigan diverge. Unlike the suppressed evidence in Jemigan, the Sweat letters do not exculpate Williams by proposing an alternative suspect to the DeLao *1276 murder; rather, they identify Fields as an additional suspect or accomplice to the crime. At most, the letters state that Williams paid Fields to commit the act, and they expressly maintain that “[Williams] is guilty of some part of it.”
That the letters identify an accomplice rather than an alternative suspect is dis-positive of Williams’s claim that the letters are material as to his conviction. Our case law advises that suppressed evidence is not exculpatory (and a Brady claim will fail) if the evidence merely suggests that another person is “equally guilty” as the defendant, or if it fails to show that “the [defendant is] not guilty, or that he [is] any less guilty.” Morris v. Ylst, 447 F.3d 735, 740 (9th Cir.2006). In Arizona, a person may be guilty of first degree murder whether he hires someone to commit the act or commits it himself, see Ariz.Rev.Stat. § 13-1105 (1989); e.g., State v. Carlson, 202 Ariz. 570, 48 P.3d 1180 (2002). Thus, while the information in the Sweat letters might have changed the prosecutor’s theory of the case at trial, it would not have made Williams any “less guilty” of first degree murder. Accordingly, the non-disclosure of the letters cannot constitute a Brady violation with respect to the jury’s finding of guilt on the murder charge.[1]
The majority points out that the Sweat letters could be exculpatory as to Williams’s guilt “if the account of events provided by McKaney and Barnett in their declarations is accurate.” Maj. Op. at 1267. I disagree. As discussed below, information that comes to light years after trial and sentencing cannot alter the materiality of potential Brady information because the Brady analysis must be made from the perspective of the prosecutor at the time of non-disclosure. The Sweat letters, not the McKaney and Barnett declarations (which were never in the prosecutor’s files), are the potential Brady material. The Sweat letters are not exculpatory as to Williams’s culpability for the crime, and McKaney and Barnett’s post hoc declarations cannot retroactively make them so.
This does not end the inquiry, however. The Supreme Court has made clear that suppressed evidence which is not material to the defendant’s guilt may still be material to the defendant’s sentence. See Cone, 129 S.Ct. at 1786. Indeed, such was the case in Brady, in which the prosecutor suppressed an accomplice’s confession to the crime for which the defendant was convicted and sentenced to death. Brady v. State, 226 Md. 422, 174 A.2d 167, 168 (1961). The state court determined that nothing in the accomplice’s confession would have reduced the defendant’s offense to a lesser crime than murder in the first degree, and hence the suppression was not material to the defendant’s guilt. Id. at 172. However, the suppression was material to the defendant’s sentence, and therefore the state court ordered a new trial on the question of punishment only. Id.; see also Cone, 129 S.Ct. at 1786 (holding that suppressed evidence was not material to the defendant’s guilt but was material to his sentence). The Supreme Court affirmed. Brady, 373 U.S. at 91, 83 S.Ct. 1194.
In this case, as in Brady, the distinction between the value of suppressed evidence as to guilt and as to punishment is significant. While the Sweat letters are not *1277 exculpatory with respect to Williams’s culpability for the crime, they are exculpatory with respect to his role in the physical act of murder, and thus raise a “reasonable probability” that, had they been disclosed, Williams would not have been sentenced to death. See Cone, 129 S.Ct. at 1783.
The state court sentenced Williams to death based on the presence of two statutory aggravating factors: (1) Williams was previously convicted of a felony involving the use or threat of violence (the armed robbery and attempted murder of Norma Soto), see Ariz.Rev.Stat. § 13-703(F)(2) (1989); and (2) Williams murdered DeLao in an especially heinous and depraved manner, see Ariz.Rev.Stat. § 13-703(F)(6) (1989).[2] State v. Williams, 183 Ariz. 368, 904 P.2d 437, 452 (1995). The state supreme court upheld application of this latter factor because the murder involved gratuitous violence “in excess of that necessary to kill,” and because DeLao was helpless during the attack. Id.
In Arizona, the “heinous and depraved portion of the (F)(6) aggravator focuses on the defendant’s state of mind at the time of the crime[ ] ... as evidenced through [the defendant’s] actions.” State v. Carlson, 202 Ariz. 570, 48 P.3d 1180, 1193 (2002) (internal citation omitted); see also State v. Gretzler, 135 Ariz. 42, 659 P.2d 1, 10 (1983) (holding that “heinous and depraved go to the mental state and attitude of the perpetrator as reflected in his words and actions”). The state court’s ruling that “[Williams] committed the murder in an especially heinous or depraved manner,” Williams, 904 P.2d at 452, was based on the assumption that Williams physically committed the crime (and hence the gratuitous violence of the slaying and helplessness of the victim could be attributed to his actions). The Sweat letters suggest, however, that Fields, and not Williams, committed the actual killing. There is nothing in the letters to indicate that Williams was even present when the murder occurred.
If the Sweat letters had been disclosed, Williams could have argued that he did not commit the crime in a heinous and depraved manner, because he did not physically murder DeLao and was not even a witness to the act. Thus, as pertains to sentencing, the letters contain exculpatory information that could have reduced the likelihood that Williams would be sentenced to death. The government’s failure to disclose the letters was also prejudicial: without the aggravating factor of heinousness and depravity, the only basis for sentencing Williams to death would have been his prior violent felony conviction, and there is a reasonable probability that the trial court would not have applied the death penalty on that basis alone. Thus, by suggesting that Fields and not Williams committed the physical act of murder, the letters “could reasonably be taken to put the whole [sentencing proceeding] in such a different light as to undermine confidence in the [penalty applied].” Kyles, 514 U.S. at 435, 115 S.Ct. 1555. As such, it was a violation of Brady for the prosecutor to withhold the letters from Williams for sentencing purposes.
C
I respectfully dissent from the majority’s decision to remand this case for an in-court evidentiary hearing. The majority *1278 errs in its decision to remand, both because Williams has waived any right to such a hearing, and because Brady does not allow a court to evaluate the materiality of suppressed evidence through the lens of information and testimony gathered years after trial.
First, the majority fails to acknowledge that Williams has waived his right to an in-court evidentiary hearing on this claim. Williams’s appellate brief makes only passing mention of the in-court hearing issue without any analysis or legal authority. The rule in this circuit is that “we review only issues which are argued specifically and distinctly in a party’s opening brief.” Greenwood v. F.A.A., 28 F.3d 971, 977 (9th Cir.1994). “We will not manufacture arguments for an appellant.” Id. Williams’s single observation that the district court should have conducted an in-person evidentiary hearing, without supporting reasoning, is insufficient to raise this issue on appeal. See Hilao v. Estate of Marcos, 103 F.3d 767, 778 n. 4 (9th Cir.1996).
To the extent this issue is even before us, Williams is barred from arguing for an in-person evidentiary hearing. Not only did Williams fail to move the district court for an in-person hearing, he actively opposed one. Indeed, the reason given by the district court for holding a paper hearing rather than an in-court one was that Williams’s motion for a hearing did “not identify specific evidence to be developed at an evidentiary hearing, or indicate why particular evidence requires oral presentation.” Later, when the government requested that the hearing be conducted in-person, Williams objected, arguing that an in-person hearing was unwarranted because “[t]he State of Arizona has had over fifteen years since they received the letters to investigate these issues, and ... five additional months provided by [the district court] specifically for” the purpose of exploring inconsistencies in the McKaney and Barnett declarations. Given Williams’s express disavowal of an in-court hearing, the district court’s decision not to hold the hearing in-person was at most invited error, and certainly not a basis for remand here. See Marx v. Loral Corp., 87 F.3d 1049, 1056 (9th Cir.1996) (stating that appellants “should be barred from asserting [a] theory on appeal” that directly contradicts their position in the district court); Deland v. Old Republic Life Ins. Co., 758 F.2d 1331, 1336 (9th Cir.1985) (stating that a litigant “may not on review complain of issues ... where the objection is inconsistent with the position taken below” (internal quotation marks omitted)).
The majority’s reasoning on this point misses the mark. While the majority explains Williams’s motivation for opposing the State’s motion (because in Williams’s view, the State should have already completed its investigation of these matters), the majority does not make clear how this additional information negates the fact that Williams expressly opposed an in-court evidentiary hearing. See Maj. Op. at 1266-67. Rather, the majority acknowledges that the State moved for an in-court evidentiary hearing, and that Williams opposed it. Maj. Op. at 1266-67.
Second, an in-person evidentiary hearing would serve no purpose in this context. A reviewing court’s evaluation of whether the suppression of a particular piece of evidence violated the prosecutor’s duties under Brady is based on the character of the information known to the prosecutor at the relevant time, that is, before trial, during the course of trial, and during sentencing. See United States v. Agurs, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (“[I]n advance of trial, and perhaps during the course of a trial as well, the prosecutor must decide what, if anything, *1279 he should voluntarily submit to defense counsel.”); Villasana v. Wilhoit, 368 F.3d 976, 979 (8th Cir.2004) (“[T]he prosecutor’s absolute duty to disclose under Brady is limited to evidence a reasonable prosecutor would perceive at the time as being material and favorable to the defense.” (emphasis added)). Information that comes to light after trial and sentencing cannot alter the materiality of potential Brady information from the only perspective that matters: the perspective of the prosecutor at the time of non-disclosure. See Agurs, 427 U.S. at 108, 96 S.Ct. 2392 (stating that, though there is a “significant practical difference between the pretrial decision of the prosecutor and the post-trial decision of the judge” in determining what evidence must be disclosed, “[l]ogieally the same standard [for evaluating the evidence] must apply at both times”). While it is true that Brady holds the prosecutor responsible for determining whether some seemingly insignificant piece of information may become material in the course of trial, the prosecutor has never been held responsible for foreseeing that such information could turn out to be material in the context of evidence developed years after trial. See Kyles, 514 U.S. at 437, 115 S.Ct. 1555 (stating that, under Brady, “the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of ‘reasonable probability’ is reached”). In light of this principle, neither the McKaney and Barnett declarations nor any further testimony at an in-court hearing can shed additional light on the question whether the prosecutor should have known that the Sweat letters were material as to Williams’s guilt.
Rather than accepting this point, the majority attempts to smuggle post hoc evidence (such as the McKaney and Barnett declarations and an evidentiary hearing) into the Brady determination for an obvious reason: the Sweat letters themselves are not exculpatory as to Williams’s guilt. Nor could a reasonable prosecutor have known that the Sweat letters might lead to exculpatory evidence, because contrary to the majority’s suggestion, see Maj. Op. at 1267-68, the declarations contradict the Sweat letters as to the crucial issue of Williams’s culpability for the crime. Prosecutors have no obligation under Brady to weigh whether the evidence in their files might somehow lead to future contradictory evidence in determining whether to disclose. To hold otherwise would be tantamount to requiring prosecutors to disclose everything in their case files, which Brady does not do. See United States v. Bagley, 473 U.S. 667, 675, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (stating that a prosecutor is not required under Brady to “deliver his entire file to defense counsel”). Because the Sweat letters themselves are not material to the guilt phase, and because post-hoe evidence will not make them so, there is no reason to require the district court to hold an evidentiary hearing.
For the same reason, the majority’s reliance on Earp v. Ornoski, 431 F.3d 1158 (9th Cir.2005), for the proposition that credibility must typically be assessed through live testimony, Maj. Op. at 1266-67, is misplaced. It may be that, where credibility is properly at issue, “an in court hearing where the judge can see and hear the witnesses” is appropriate. Maj. Op. at 1266 (citing Earp, 431 F.3d at 1169-70). But because no credibility question arises in Williams’s claim, there is no basis to hold such a hearing here.
Accordingly, the majority errs both in providing a form of relief to which Williams is not entitled, and in requiring the district court to consider the materiality of the Sweat letters in the context of *1280 after-acquired evidence that was not known and could not have been known to the government at the time of trial. The majority’s new formulation of the prosecutor’s Brady obligation represents a dangerous expansion, one which is contrary to the Supreme Court’s balanced approach.
II
Although I concur in the result reached by the majority on Williams’s other two claims, namely his claim under AEDPA that the state court unreasonably applied Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), and his claim under AEDPA that the state court should not have required a causal nexus between his drug use and crime of conviction at sentencing, I disagree with the majority’s analysis, for the reasons described below.
A
Williams argues that the state court unreasonably applied Ake, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53, when it denied him psychiatric assistance at sentencing to present mitigating evidence related to his crack cocaine usage. The state supreme court reached this claim, but did not explain its reasoning in rejecting it. I agree with the majority that when the state court denies relief on the merits but provides no rationale for its decision, we “perform an ‘independent review of the record’ to ascertain whether the state court decision was objectively unreasonable.” Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.2003) (quoting Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir.2000)). In this situation, AEDPA deference still applies; “[tjhat is, although we independently review the record, we still defer to the state court’s ultimate decision.” Pirtle, 313 F.3d at 1167. “Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable.” Himes, 336 F.3d at 853.
In setting forth the standard for when a criminal defendant is entitled to a psychiatric expert provided by the state, Ake distinguishes between the trial and sentencing phases of the defendant’s criminal proceedings. See 470 U.S. at 83, 105 S.Ct. 1087. At trial, “when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial,” Ake holds that “the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.” Id. Psychiatric assistance in this context is limited by its terms to the defendant’s trial and trial preparation, and does not extend to the defendant’s sentencing proceedings. See id.
With respect to the defendant’s due process entitlement to a psychiatric expert at sentencing, Ake provides a separate test. Under Ake, entitlement to a psychiatric expert at sentencing is limited to defendants charged with capital crimes. See id. (“We have repeatedly recognized the defendant’s compelling interest in fair adjudication at the sentencing phase of a capital case.”). “[I]n the context of a capital sentencing proceeding,” Ake holds that a defendant is entitled to a mental health expert only “when the State presents psychiatric evidence of the defendant’s future dangerousness.” Id. at 84, 105 S.Ct. 1087. The defendant may use the psychiatric expert in this situation to “rebut the State’s evidence of his future dangerousness.” Id.
The majority fails to even acknowledge that Ake provided distinct tests for the trial phase and penalty phase of a defendant’s case. Instead, the majority applies *1281 Ake’s test for the trial phase to Williams’s claim that he was deprived of a psychiatric expert at sentencing. Maj. Op. at 1269 (interpreting Ake as requiring the government to provide a psychiatric expert to a defendant, both at trial and capital sentencing, when the defendant can make the threshold showing that “his sanity at the time of the offense is to be a significant factor” (internal quotation mark omitted)); cf. Tuggle v. Netherland, 516 U.S. 10, 12, 116 S.Ct. 283, 133 L.Ed.2d 251 (1995) (“[W]e held in Ake [ ], that when a prosecutor presents psychiatric evidence of an indigent defendant’s future dangerousness in a capital sentencing proceeding, due process requires that the State provide the defendant with the assistance of an independent psychiatrist”); Simmons v. South Carolina, 512 U.S. 154, 165, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (interpreting Ake as holding that a defendant is entitled to a psychiatric expert at capital sentencing proceedings “where the State presents psychiatric evidence of a defendant’s future dangerousness”). The majority’s interpretation of Ake, in my view, is erroneous.
Because Williams argues that he was denied a psychiatric expert only at sentencing, the state court’s rejection of Williams’s Ake claim could be contrary to or an unreasonable application of Ake only if the government presented psychiatric evidence of Williams’s future dangerousness in his capital sentencing proceedings. 470 U.S. at 86, 105 S.Ct. 1087 (holding that the defendant was entitled to a psychiatric expert at sentencing because his “future dangerousness was a significant factor at the sentencing phase”). Here, the government did not. Applying the required level of AEDPA deference, it was therefore not objectively unreasonable for the state court to deny this claim. See § 2254(d)(1); Lockyer v. Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).
B
The state court refused to treat Williams’s drug use as a mitigating factor in deciding his sentence. Williams contends that the state court’s refusal was based on a requirement that his drug use have a direct causal nexus to his crime of conviction, and that this causal requirement was contrary to or an unreasonable application of Supreme Court precedent. See, e.g., Eddings v. Oklahoma, 455 U.S. 104, 114-15, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). Because the state supreme court adjudicated this claim on its merits in a reasoned decision, the deferential AEDPA standard applies. See Himes, 336 F.3d at 852-53. Therefore, under § 2254(d)(1), we can reverse the state court’s decision only if it “was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.”
As described in the majority opinion, at the time of Williams’s trial, Arizona courts refused to consider mitigating evidence unless that evidence had a nexus to the crime for which the defendant was being sentenced. See, e.g., State v. Djerf, 191 Ariz. 583, 959 P.2d 1274, 1289 (1998). Following this rule, the state sentencing court declined to consider Williams’s drug use as a mitigating factor because it determined that, “[wjithout a showing of some impairment at the time of the offense, drug use cannot be a mitigating circumstance of any kind.” Williams, 904 P.2d at 453.
I agree with the majority that this decision by the state court was contrary to the clearly established Supreme Court holdings in Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality), and Eddings, 455 U.S. 104, 102 S.Ct. 869, both of which prohibit courts from categorically excluding mitigating evidence *1282 from consideration in capital sentencing proceedings. See Eddings, 455 U.S. at 114-15, 102 S.Ct. 869 (“[The sentencing court] may determine the weight to be given relevant mitigating evidence. But [the court] may not give it no weight by excluding such evidence from [its] consideration.”); Lockett, 438 U.S. at 604, 98 S.Ct. 2954 (“[I]n all but the rarest kind of capital case, [the sentencing court should] not be precluded from considering, as a mitigating factor, any aspect of the defendant’s character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.” (emphasis and footnote omitted)).
I write separately, however, because I disagree with the majority’s reliance on Tennard v. Dretke, 542 U.S. 274, 284-87, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004), and Smith v. Texas, 543 U.S. 37, 45, 125 S.Ct. 400, 160 L.Ed.2d 303 (2004), as “clearly established Federal law” relevant to analyzing the state court’s decision under AEDPA. The Supreme Court has made clear that “ ‘clearly established Federal law’ under [AEDPA] is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.” Lockyer, 538 U.S. at 71-72, 123 S.Ct. 1166 (emphasis added); see also Murdoch v. Castro, 609 F.3d 983, 990 (9th Cir.2010) (en banc) (“The Supreme Court has restricted ‘clearly established Federal law’ under § 2254(d)(1) to ‘the holdings, as opposed to the dicta, of [the Supreme] Court’s decisions as of the time of the relevant state-court decision.’” (internal quotation marks omitted) (emphasis added) (quoting Carey v. Musladin, 549 U.S. 70, 74, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006))). As such, a federal court reviewing a state court’s decision under AEDPA must consider only those Supreme Court precedents that were available to the state court at the time it conducted its review. See Williams v. Taylor, 529 U.S. 362, 390, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). We cannot fault the state court for failing to apply a precedent that did not come into existence until after its consideration of a petitioner’s case. See id.
Here, the state supreme court rendered its decision on September 26, 1995. Williams, 904 P.2d 437. Therefore, at the time of its decision, the state supreme court had the benefit of the Supreme Court’s holdings in Lockett, 438 U.S. 586, 98 S.Ct. 2954, and Eddings, 455 U.S. 104, 102 S.Ct. 869, which were issued in 1978 and 1982, respectively. Those cases constitute “clearly established Federal law” under AEDPA. See § 2254(d)(1); Lockyer, 538 U.S. at 71-72, 123 S.Ct. 1166. By contrast, the state supreme court did not have the benefit of Smith, 543 U.S. 37, 125 S.Ct. 400, and Tennard, 542 U.S. 274, 124 S.Ct. 2562, both of which were decided in 2004, almost a decade after the state court reviewed Williams’s claim. Smith and Tennard are therefore not “clearly established Federal law,” and the state court’s decision cannot be judged against the principles announced in those cases. See Murdoch, 609 F.3d at 990.
The majority’s reasoning that “Tennard and Smith are retroactively applicable” to Williams’s claim, Maj. Op. at 1271, is beside the point. The issue is whether those cases are “clearly established” Supreme Court precedents under AEDPA, § 2254(d)(1); whether they announced retroactively applicable principles poses an entirely different question, which is not raised here, cf. Schad v. Ryan, 606 F.3d 1022, 1045 (9th Cir.2010). See Williams, 529 U.S. at 412, 120 S.Ct. 1495 (explaining that whether a Supreme Court precedent is retroactively applicable to a defendant’s claim poses a different question than whether the precedent is “clearly estab *1283 lished” for AEDPA purposes). Smith and Tennard are relevant, at most, because they reiterate the rule announced in Eddings and Lockett. See Styers v. Schriro, 547 F.3d 1026, 1035 (9th Cir.2008) (per curiam) (citing Smith for the principle articulated in Eddings). But beyond this limited applicability, Smith and Tennard are not and cannot themselves be considered “clearly established Federal law” for purposes of this court’s analysis of Williams’s claim.
Ill
The majority erroneously remands to the district court for an in-court evidentiary hearing on matters not relevant to deciding Williams’s Brady claim. Not only is an in-court evidentiary hearing not warranted here, but it is a form of relief that Williams did not properly request before this court, and expressly disavowed before the district court. In my view, the government’s failure to disclose to the defense credible information concerning an alternative perpetrator to the murder constituted a Brady violation with respect to Williams’s sentence, and Williams’s writ should be granted as to his punishment. I therefore respectfully dissent from the majority’s treatment of Williams’s Brady claim. Except for the issues identified above, I join my colleagues’ decision as to the remainder of Williams’s claims.

. Nor could the letters be used to impeach Deloney's credibility. See Strickler, 527 U.S. at 281-82, 119 S.Ct. 1936 (suppressed information is favorable to the accused when it is exculpatory or has impeachment value). Deloney testified that Williams confessed to her that he committed the crime. The letters do not bear any relation to Deloney’s statements that Williams confessed, nor do they call into question Deloney's veracity as a witness.

. The state court found no statutory mitigating factors, but found as non-statutory mitigation that Williams had no criminal record prior to the murder and that defendant had in the past displayed good conduct and character. Concluding that the mitigating evidence was insufficient to invoke leniency, the state court sentenced Williams to death. Williams, 904 P.2d at 444.