IN THE

# ARIZONA COURT OF APPEALS
DIVISION TWO

---

THE STATE OF ARIZONA,
*Appellee,*

*v.*

VERONICA SANCHEZ-EQUIHUA,
*Appellant.*

No. 2 CA-CR 2013-0003
Filed May 19, 2014

---

Appeal from the Superior Court in Pima County
No. CR20113283002
The Honorable Howard Hantman, Judge

**VACATED AND REMANDED**

---

COUNSEL

Thomas C. Horne, Arizona Attorney General
Joseph T. Maziarz, Section Chief Counsel, Phoenix
By Amy Pignatella Cain, Assistant Attorney General, Tucson
*Counsel for Appellee*

Law Offices of Cornelia Wallis Honchar, P.C., Tucson
By Cornelia Wallis Honchar
*Counsel for Appellant*

## OPINION

Presiding Judge Kelly authored the opinion of the Court, in which Judge Eckerstrom concurred and Judge Espinosa dissented in part and specially concurred in part.

K E L L Y, Presiding Judge:

**¶1**　　　Veronica Sanchez-Equihua appeals from her convictions and sentences for two counts of possession of a narcotic drug for sale and one count of possession of drug paraphernalia. She argues her constitutional right to compulsory process was violated because a term in her codefendants' plea agreements prevented them from testifying on her behalf and the trial court erred by failing to compel the witnesses to testify.[1] We vacate her convictions and sentences and remand for a new trial.

## Factual and Procedural Background

**¶2**　　　We view the facts in the light most favorable to upholding Sanchez-Equihua's convictions and sentences. *See State v. Becerra*, 231 Ariz. 200, ¶ 2, 291 P.3d 994, 996 (App. 2013). In September 2011, police discovered powder cocaine and cocaine base in a car driven by Jahziel Gutierrez. Suspecting the drugs had been supplied from an apartment shared by Sanchez-Equihua and her husband Ivan Orantes-Lerma, police searched the apartment the same day. In the kitchen they found cocaine and cocaine base in a lunch bag and a small bag on the counter. They also discovered two drug-ledger notebooks in the apartment. Police did not see Sanchez-Equihua during their surveillance of the apartment, and no residents were home when the apartment was searched.

---

[1]Sanchez-Equihua also argues, and the state concedes, the imposition of a criminal restitution order constituted an illegal sentence. Because we vacate her convictions and sentences, we do not reach this issue.

¶3        Sanchez-Equihua, Orantes-Lerma, and Gutierrez were charged with multiple offenses based on the drugs seized that day. Orantes-Lerma and Gutierrez each pled guilty to one count of attempted possession of a narcotic drug for sale and were sentenced accordingly.  Both plea agreements included the following "special term":  "Defendant agrees that he/she has no exculpatory information as to any codefendant(s)." [2]  Each agreement also provided that the defendant waived all double jeopardy and statute of limitations claims, so that "[i]f the defendant fail[ed] to comply with any of the provisions or conditions of th[e] plea agreement at any time before or after sentencing," the agreement would "become void," and the state would be "free to prosecute the defendant for all charges."

¶4        Sanchez-Equihua proceeded to a jury trial.  The trial court asked the parties to address an issue that had been raised "concerning the codefendant[s'] Fifth Amendment rights," explaining "both [had] signed pleas indicating they had no exculpatory evidence," but that "[t]hey now want to exculpate [Sanchez-Equihua]."  Counsel for the state did not take a definitive position on whether exculpatory testimony by Orantes-Lerma or Gutierrez would constitute a breach of their agreements, but stated she thought the clauses were material and enforceable.  She told the court it was "a legal possibility" the state would seek to withdraw the pleas if they testified, and acknowledged she had conveyed that possibility to codefendants' counsel.  Sanchez-Equihua argued the codefendants no longer could validly invoke their Fifth Amendment privilege because their convictions and sentences were final and they had waived their right against self-incrimination in this case.

¶5        Orantes-Lerma and Gutierrez appeared before the trial court on the second day of trial.  Orantes-Lerma had stated in a presentence report that Sanchez-Equihua "did not know about the drugs."  But his counsel told the court she believed "if [Orantes-Lerma] were to testify on the stand at this point it would be a violation of his plea bargain and the State would be able to

---

[2]The terms of Orantes-Lerma's agreement also provided the agreement was contingent upon Sanchez-Equihua accepting a plea.

withdraw from the plea," placing him in jeopardy. Orantes-Lerma ultimately invoked his Fifth Amendment privilege "so as not to have to start once again and be tried again." Gutierrez similarly stated he had decided "[n]ot to testify because [he did not] want to break [his] plea." The court stated the plea agreement clause was "a legitimate prosecutorial tool . . . when anticipating a problem with the codefendant exonerating [an]other defendant post plea and post sentence." It concluded it could not compel Orantes-Lerma or Gutierrez to testify.

¶6        After the jury found her guilty, Sanchez-Equihua was sentenced to concurrent terms of imprisonment totaling three years. This appeal followed.

**Plea Agreement Term**

¶7        Sanchez-Equihua argues the no-exculpatory-information term in her codefendants' plea agreements violated her Sixth Amendment right to compulsory process to call witnesses in her favor. *See* U.S. Const. amend. VI; *see also* Ariz. Const. art. II, § 24 ("In criminal prosecutions, the accused shall have the right . . . to have compulsory process to compel the attendance of witnesses in his own behalf."). We review constitutional issues and purely legal questions de novo. *State v. Gay*, 214 Ariz. 214, ¶ 4, 150 P.3d 787, 790 (App. 2007).

¶8        A criminal defendant has a Sixth Amendment right to "present his own witnesses to establish a defense." *Washington v. Texas*, 388 U.S. 14, 18-19 (1967). The United States Supreme Court has recognized that the right to offer witness testimony and to compel witnesses' attendance when necessary is so fundamental that it is incorporated into the Fourteenth Amendment's Due Process Clause and therefore applies to the states. *Id.* at 17-19. "It is well established that 'substantial government interference with a defense witness's free and unhampered choice to testify amounts to a violation of due process.'" *Earp v. Ornoski*, 431 F.3d 1158, 1170 (9th Cir. 2005), *quoting United States v. Vavages*, 151 F.3d 1185, 1188 (9th Cir. 1998); *see also Webb v. Texas*, 409 U.S. 95, 97-98 (1972).

¶9        The state emphasizes that a witness's Fifth Amendment right to refuse to testify can "trump" a defendant's Sixth Amendment right to compel the witness's testimony. *State v. Carlos*, 199 Ariz. 273, ¶ 18, 17 P.3d 118, 123 (App. 2001). We agree, and Sanchez-Equihua concedes that this is an accurate statement of law. However, it does not answer the issue presented in this case. Sanchez-Equihua does not, as the state suggests, argue she should have been able to compel the codefendants to waive their Fifth Amendment privilege. Instead, she contends the state impermissibly used its power to substantially interfere with their decision whether to testify.

¶10       Arizona case law has not addressed directly whether the specific plea agreement term challenged in this case violates a defendant's Sixth Amendment rights. However, in *State v. Fisher*, 176 Ariz. 69, 859 P.2d 179 (1993), our supreme court addressed the validity of a similar plea agreement condition that compelled a witness to testify consistently with a previous statement.

¶11       In that case, defendant James Fisher and his wife, Ann, both had been charged with murder. *Id.* at 71, 859 P.2d at 181. Ann signed an agreement allowing her to plead guilty to a reduced charge if her testimony at James's trial did "not vary substantially in relevant areas [from] statements previously given investigative officers." *Id.* At James's trial, Ann invoked her Fifth Amendment rights and refused to testify. *Id.* At a later hearing on James's motion for a new trial, Ann testified about conflicting statements she had made about whether she or James had killed the victim. *Id.* at 72, 859 P.2d at 182. She stated she had invoked her Fifth Amendment right at his trial based equally on her counsel's advice and on her desire to preserve her agreement with the state. *Id.*

¶12       The *Fisher* court concluded that, although a plea agreement may properly be conditioned upon truthful and complete testimony, "consistency provisions," including the one contained in the wife's agreement, were unenforceable. *Id.* at 73, 859 P.2d at 183. It first noted the state's "ethical responsibility to 'scrupulously avoid any suggestion calculated to induce the witness to suppress or deviate from the truth, or in any degree to affect his free and untrammeled conduct when appearing at the trial or on the witness

stand.'" *Id.*, *citing State v. Fisher*, 141 Ariz. 227, 244 n.5, 686 P.2d 750, 767 n.5 (1984) *and* ABA Canons of Prof'l Ethics 39. And it pointed out that consistency provisions "taint the truth-seeking function of the courts by placing undue pressure on witnesses to stick with one version of the facts regardless of its truthfulness" and "frustrate the jury's duty to determine the credibility of the witness." *Id.* at 74, 859 P.2d at 184. The court acknowledged that, although Ann had not testified at James's trial, she arguably "was prevented from supplying evidence helpful to the defendant by reason of the improper . . . provision." *Id.* It cited with approval cases from other jurisdictions holding that "due process prohibits a plea agreement from conditioning leniency upon anything other than truthful and complete testimony," and ultimately concluded "the prosecution should have bargained with Ann only for truthful and accurate testimony." *Id.* at 73, 74, 859 P.2d at 183, 184.

¶13 In *State v. Rivera*, 210 Ariz. 188, ¶ 1, 109 P.3d 83, 84 (2005), our supreme court clarified that a plea-agreement term avowing that a previous statement was true did not violate due process when the agreement also required truthful testimony. The court determined Rivera's rights were adequately protected because the witnesses' plea agreements in his case "neither compel[led] the witnesses to disregard their oaths of truthfulness nor b[ound] them to a particular script or result." *Id.* ¶ 18. It found that, under the terms of the agreement, the witness had a "paramount obligation to testify truthfully" and encouraged the state to ensure that witnesses signing such agreements in the future understood that obligation. *Id.* ¶¶ 26, 29.

¶14 Other jurisdictions have analyzed plea-agreement terms more similar to the ones at issue in this case; most of those cases involve "no-testimony" clauses, in which the pleading defendant agrees not to testify in regard to another defendant. All of the cases we have found that address this issue have concluded such agreements violate due process. *E.g.*, *Maples v. Stegall*, 427 F.3d 1020, 1033-34 (6th Cir. 2005) (plea requirement to not testify on codefendant's behalf impaired defense and may have violated right to compulsory process); *United States v. Henricksen*, 564 F.2d 197, 198 (5th Cir. 1977) (agreement not to testify in any manner regarding

codefendant constituted substantial interference with witness's choice to testify and violated due process); *State v. Asher*, 861 P.2d 847, 850-51 (Kan. Ct. App. 1993) (threatening witness with denial of plea agreement if he testified violated due process rights and hindered jury "in its search for truth"); *Bhagwat v. State*, 658 A.2d 244, 249 (Md. 2002) (plea agreement term inducing or encouraging witness's silence denies right to compulsory process); *State v. Fort*, 501 A.2d 140, 144 (N.J. 1985) ("no testimony" agreement violated rights to due process and to present favorable witnesses). The basic principles of due process relied upon in these cases are consistent with those articulated in *Fisher*. As the court noted in *Fort*, "although inevitably an adversarial proceeding, [a trial] is above all else a search for truth[; t]hat quest is better served when the State does not suppress the truth by sealing the lips of witnesses." 501 A.2d at 144.

¶15 We conclude the no-exculpatory-information clauses in the codefendants' plea agreements, as they were applied in this case, substantially interfered with their "free and unhampered choice to testify," thereby violating Sanchez-Equihua's right to compulsory process. *See Earp*, 431 F.3d at 1170. In contrast to the agreement upheld in *Rivera*, the agreements signed by Orantes-Lerma and Gutierrez did not include a term establishing or clarifying a "paramount obligation to testify truthfully." 210 Ariz. 188, ¶ 26, 109 P.3d at 88-89.

¶16 Although the clauses in this case did not explicitly preclude the pleading defendants from testifying, the state acknowledged their purpose was to prevent codefendants from taking a plea and then "tak[ing] the fall" for another codefendant. Consistent with that purpose, the prosecutor notified the potential witnesses their testimony could lead to reinstated charges,[3] and both witnesses indicated their decision not to testify was motivated by a desire to avoid that risk. In this way, the clauses, like the improper

---

[3]We find no support for the state's suggestion that in order for Sanchez-Equihua to establish a violation of her constitutional rights, she was required to show the prosecutor was "acting in a[] vindictive or intimidating manner."

"consistency clauses" discussed in *Fisher*, "taint[ed] the truth-seeking function of the court[] by placing undue pressure on [the] witnesses to stick with one version of the facts regardless of its truthfulness." 176 Ariz. at 74, 859 P.2d at 184. And, by preempting Sanchez-Equihua's ability to present her witnesses, the agreements undermined the jury's ability to make its own determination of the witnesses' credibility. *See id.*; *see also Rivera*, 210 Ariz. 188, ¶ 11, 109 P.3d at 85 (cross-examination "appropriate tool" for probing witness's truthfulness; should expose any motivation to lie). Therefore, Sanchez-Equihua is entitled to a new trial. *See Carlos*, 199 Ariz. 273, ¶ 27, 17 P.3d at 125.

¶17 In a related argument, Sanchez-Equihua contends the trial court abused its discretion by failing to compel her codefendants to testify. Although we need not resolve this issue separately because we already have determined Sanchez-Equihua is entitled to a new trial, we address the subject briefly because it is likely to recur on remand. *See State v. May*, 210 Ariz. 452, ¶ 1, 112 P.3d 39, 40 (App. 2005).

¶18 If a witness validly invokes his Fifth Amendment right against self-incrimination, the defendant's right to compulsory process must yield to the witness's privilege to remain silent. *State v. Rosas-Hernandez*, 202 Ariz. 212, ¶ 10, 42 P.3d 1177, 1181 (App. 2002). However, "to validly invoke Fifth Amendment rights, a witness must demonstrate a reasonable ground to apprehend danger from being compelled to testify." *Id.* ¶ 11. Generally, when "there can be no further incrimination," such as when a judgment and sentence have become final, "there is no basis for the assertion of the privilege." *Mitchell v. United States*, 526 U.S. 314, 326 (1999).

¶19 It appears the trial court's decision whether to compel Orantes-Lerma and Gutierrez to testify was based on its belief that their charges could be reinstated as a result of any testimony on Sanchez-Equihua's behalf. For the reasons stated above, however, it would be error to allow the state to revoke the codefendants' plea agreements based on their decision to testify truthfully at Sanchez-Equihua's trial. Therefore, to the extent the codefendants on remand seek to invoke their privilege to remain silent, we conclude they cannot do so based on the no-exculpatory-information clauses

because the clauses do not constitute a "reasonable ground to apprehend danger" of further incrimination. *Rosas-Hernandez*, 202 Ariz. 212, ¶ 11, 42 P.3d at 1181.

## The Dissent and Special Concurrence

**¶20** Our dissenting and specially concurring colleague focuses on the plea agreement term and how it should have been interpreted. However, the issue we are asked to decide in this appeal is not whether the term on its face necessarily results in a constitutional violation but whether Sanchez-Equihua's rights were violated by its interpretation and application in this case. Our resolution depends on the record, including the state's representation that the term was inserted for the purpose of hindering particular testimony (precisely the type of testimony suggested by Orantes-Lerma's presentence report—"tak[ing] the fall" for the defendant by accepting full responsibility), the state's opinion that the term was material and enforceable, its communication to the defendants that there was a risk of reinstated charges if they testified, and the codefendants' statements on the record that this was the reason for their invocations.

**¶21** The dissent suggests the exculpatory evidence term in the codefendants' plea agreements was included to ensure the state's compliance with its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). But, as discussed above, the state's actual use of the term belies the suggestion that its purpose was to disclose all exculpatory evidence to Sanchez-Equihua. Given that the facts underlying the prosecution here would likely generate a motive for one codefendant to exculpate another—including that Sanchez-Equihua was the spouse of one of the codefendants—and given the state's actual use of the exculpatory evidence clause when Sanchez-Equihua sought to secure the testimony of the codefendants—we think it more likely the term was placed in the agreement to address the predictable risk that the pleading codefendants might exonerate

any non-pleading codefendants after securing their own sentence reductions.[4]

¶22      Our view differs from that of our dissenting colleague in that we believe the assessments of the trial court, the state, and the codefendants with the aid of their counsel—who all concluded the terms presented sufficient risk of material breach to affect the codefendants' decision to testify—were reasonable and could recur. Contrary to our colleague's contention that the agreements did not "set forth any consequences for any potential or perceived violation of the codefendants' representations," they explicitly provided that "[i]f the defendant fail[ed] to comply with any of the provisions or conditions of th[e] plea agreement at any time before or after sentencing," the agreement would "become void," and the state would be "free to prosecute the defendant for all charges." The threat is not an empty one: even after sentencing, when a defendant violates a plea agreement, the court may set aside the judgment and plea and reinstate the original information. *See Ricketts v. Adamson*, 483 U.S. 1, 7-8 (1987) (affirming Arizona court's conviction of defendant for first-degree murder after he had been sentenced for lesser offense pursuant to plea agreement but refused to testify at codefendants' retrial); *Adamson v. Superior Court*, 125 Ariz. 579, 583-84, 611 P.2d 932, 936-37 (1980).

¶23      We agree with our colleague that the trial court's interpretation of the agreement ultimately was incorrect; as this opinion now clarifies, the terms are unenforceable to the extent they prohibit truthful testimony. But we cannot conclude that, because the terms should not have been interpreted as they were, and the constitutional violation should not have happened, that there was no violation. Instead, we answer the question Sanchez-Equihua has presented on appeal, which requires us to consider how the term was used in this case and what ultimate effect it had on

---

[4] Of course, as *Rivera* makes clear, there are other ways, including redrafting the provision in question, by which the state may achieve this legitimate goal without "frustrat[ing] the jury's duty to determine the credibility of the witness[es]." *Fisher*, 176 Ariz. at 74, 859 P.2d at 184.

Sanchez-Equihua's ability to present her defense. It is up to the state to decide whether and how it uses such terms in the future. This opinion merely clarifies that, if the terms ultimately are used to hinder testimony, as they were in this case, a constitutional violation has occurred.

¶24 Our colleague contends we have taken *Fisher* "too far" by applying it in this case because the agreement here did not require consistent testimony. This narrow approach discounts significant aspects of *Fisher* and the overall body of case law upon which we have relied, which reflects well-settled principles of due process prohibiting interference with witness testimony regardless of form. *See Fisher*, 176 Ariz. at 74, 859 P.2d at 184 (witness prevented from supplying testimony by reason of improper plea agreement provision; agreement may be conditioned only on truthful and accurate testimony); *see also, e.g.*, *Washington*, 388 U.S. at 22-23 (rule disqualifying accomplice testimony violates right to compulsory process); *Earp*, 431 F.3d at 1170 (test for violation of due process is whether government has interfered with free and unhampered choice to testify); *Henricksen*, 564 F.2d at 198 (agreement not to testify interfered with witness's choice to testify and violated due process); *Bhagwat*, 658 A.2d at 249 (plea agreement term inducing or encouraging witness's silence denies right to compulsory process); *Fort*, 501 A.2d at 144 ("no testimony" agreement violated defendant's due process rights). Rather than "broadly invalidat[ing] any provision conceivably construed as influencing a witness's decision to testify," as our colleague suggests, we have simply applied the established rule that prohibits the government from substantially interfering with a witness's unhampered choice to testify. *See Earp*, 431 F.3d at 1170.

## Harmless Error Review

¶25 The state argues any error was harmless because even absent the no-exculpatory-information clause, the codefendants would have invoked their Fifth Amendment privilege against self-incrimination and refused to testify and because the evidence of Sanchez-Equihua's guilt was overwhelming.

**¶26**        "We must reverse a conviction unless we are 'confident beyond a reasonable doubt that the error had no influence on the jury's judgment.'"  *Carlos*, 199 Ariz. 273, ¶ 24, 17 P.3d at 124, *quoting State v. Bible*, 175 Ariz. 549, 588, 858 P.2d 1152, 1191 (1993).   The determination must be made on a case-by-case basis.  *Id.*  The state has the burden to prove any error was harmless.  *State v. Henderson*, 210 Ariz. 561, ¶ 18, 115 P.3d 601, 607 (2005).

**¶27**        The record contradicts the state's assertion that "even in the absence of the plea agreements, the codefendants still would have asserted their Fifth Amendment privilege against self-incrimination."   First, both codefendants stated on the record that they were invoking their Fifth Amendment right in order to avoid breaching their plea agreements.   Second, it is apparent the trial court's decision not to compel the witnesses' testimony was based, at least in part, on its erroneous belief that the codefendants faced a risk of reinstated charges because the exculpatory-information clauses could be enforceable to prohibit testimony.

**¶28**        Nor has the state carried its burden to establish any error was harmless by presenting overwhelming evidence of Sanchez-Equihua's guilt.  Without further discussion or any citation to evidence in the record, it makes a single, conclusory statement that "the evidence against Sanchez-Equihua was overwhelming, such that the testimony of the codefendants would not have offered her much help."  Based on our review of the record, we conclude the evidence, although sufficient, was not overwhelming.[5]  And we will not speculate about the weight the jury may have given any exculpatory testimony by Orantes-Lerma or Gutierrez.   Therefore, we cannot conclude beyond a reasonable doubt that the violation of

---

[5]The evidence consisted of the cocaine and cocaine base found in a lunch bag and small plastic baggie while Sanchez-Equihua was not at home, and her handwriting on a few pages of two notebooks used as drug ledgers, which were found in the apartment.  Sanchez-Equihua testified she did not know the notebooks were drug ledgers and her husband had gotten upset and nervous when he saw her writing in one.

Sanchez-Equihua's compulsory process rights had no influence on the convictions. *See Carlos*, 199 Ariz. 273, ¶ 24, 17 P.3d at 124.

## Disposition

**¶29** For the foregoing reasons, we vacate Sanchez-Equihua's convictions and sentences and remand the case for a new trial.

E S P I N O S A, Judge, dissenting in part, specially concurring in part:

**¶30** I respectfully disagree with a significant portion of the majority's reasoning because, in my view, *State v. Fisher*, 176 Ariz. 69, 859 P.2d 179 (1993), is too far removed from the situation at hand to be embraced as controlling authority. The majority also implicitly creates a broad rule for the narrow issue involved in this case and unnecessarily invalidates a legitimate and reasonable term of the plea agreements here. I concur in the result to the extent that I agree the codefendants may not invoke their privilege to remain silent based on the no-exculpatory-information clauses, but not because the clause, or its use here, is unconstitutional, and I too would remand this case. In my view, however, we should do so for the trial court to determine whether the state intended to withdraw from the plea agreements if either or both codefendants were to testify on the defendant's behalf, whether such withdrawal could be legally accomplished under the terms of these agreements, and if not, as I believe to be the case for the reasons outlined below, whether one or both codefendants would testify at a new trial. If they would decline, a potential eventuality the majority does not address, no new trial would be warranted and Sanchez-Equihua's convictions should stand.

**¶31** In *Fisher*, the agreement with the cooperating codefendant specifically contemplated her testimony at trial and included an express "condition" that if "called as a witness in the trial of James Fisher . . . her testimony w[ould] not vary substantially in relevant areas to statements previously given investigative officers." 176 Ariz. at 71, 859 P.2d at 181 (alteration in *Fisher*). This clause was held to be an unenforceable "consistency provision" that

tended to coercively script the cooperating witness's testimony in violation of due process. *Id.* at 74-75, 859 P.2d at 184-85. As the majority points out, other courts have come to similar conclusions on comparable facts to *Fisher*, involving express strictures on trial testimony in every case cited. But in sharp contrast to such "testimonial" plea agreements, the form of agreement used here merely provided: "Defendant agrees that he/she has no exculpatory information as to any co-defendant." It is clear that no testimony by either codefendant in this case was required or sought. The majority's decision today, however, could broadly invalidate any provision conceivably construed as influencing a witness's decision to testify. Given the realities of plea bargaining and the sometimes complex issues involved, this takes *Fisher* too far.

¶**32**      Significantly, there is nothing in the codefendants' plea agreements conditioning their plea bargains on any testimony, let alone consistent testimony at the defendant's trial. *Cf. Fisher*, 176 Ariz. at 72-73, 859 P.2d at 182-83 ("avowal" by cooperating witness that testimony "will not vary substantially" from previous statements to law enforcement). Nor do the agreements set forth any consequences for any potential or perceived violation of the codefendants' representations that they "ha[d] no exculpatory information." Although the majority insists that language pertaining to a "fail[ure] to comply with any of the [agreement's] provisions or conditions" would permit the state to withdraw from the agreement if a codefendant later provided such information, on closer examination, this interpretation is inconsistent with our precedents and difficult to justify.

¶**33**      It is well-established that once a plea agreement has been accepted by the parties and court, the state generally may not rescind the agreement and reinstate the prosecution because jeopardy has attached. *See Aragon v. Wilkinson*, 209 Ariz. 61, ¶ 7, 97 P.3d 886, 889 (App. 2004); *Coy v. Fields*, 200 Ariz. 442, ¶ 5, 27 P.3d 799, 801 (App. 2001); *Dominguez v. Meehan*, 140 Ariz. 329, 331, 681 P.2d 912, 914 (App. 1983). But when a defendant breaches a material term of the agreement, he waives double jeopardy, and the state may be permitted to withdraw from the plea. *See Coy*, 200 Ariz. 442, ¶ 5, 27 P.3d at 801. This waiver is strictly limited, however, to the

specific circumstances identified in the agreement as permitting withdrawal. Thus, "the pivotal question . . . is whether [defendant] breached the agreement." *Id*. ¶ 6; *see also Aragon*, 209 Ariz. 61, ¶ 11, 97 P.3d at 890 (reversing grant of state's motion to withdraw after change in sentencing law because defendant did not actually breach any term of the plea agreement). Here, because no testimony was required or, for that matter, prohibited by the plea agreements as in *Bhagwat v. State*, 658 A.2d 244, 249 (Md. 1995), cited by the majority, it is difficult to see how either codefendant's testifying in the defendant's trial could constitute a "fail[ure] to comply" and, more importantly, be deemed a material breach of their plea agreements.

¶34 It should be emphasized that the provision at issue here—presented in the agreement as a "special term"—merely described the codefendants' asserted lack of exculpatory information. Nowhere is this claim made a condition of the plea, unlike the term directly following it in Orantes-Lerma's agreement, which specifically states: "Plea is contingent on co-defendant, Veronica Sanchez-Equihua, accepting plea." [6] Absent any requirement or compulsion for the codefendants to testify, it appears the special term primarily served a strategic purpose of documenting and preserving the codefendants' statements in a significant manner as part of their pleas, and helped ensure compliance with the state's obligations under *Brady v. Maryland*, 373 U.S. 83 (1963).

¶35 I do not merely "suggest" the latter purpose as posited by my colleagues. Indeed, contrary to the majority's speculation, the prosecutor expressly stated in clear and certain terms, on the record, that this clause was "put in so that it alerts defense counsel . . . [and the pleading] defendant that if they have exculpatory information[,] that's something they need to provide to us." The prosecutor continued,

---

[6] It is notable the state could have successfully sought to withdraw from the plea agreements on this clear basis had it wished to, which had nothing to do with the no-exculpatory-information term at issue here.

> what typically happens is a defense attorney is presented with one of these agreements, and talks to their client and finds out they do have exculpatory information. They contact our office. . . . Then . . . that information is investigated. Sometimes it results in a dismissal of charges against [a] codefendant[.]

Neither the trial court nor any of the three defense counsel present questioned or refuted that legitimate motive. And it was in this context that, rather than "represent[ing] that the term was inserted for the purpose of hindering particular testimony," the prosecutor further added

> [B]ut it's also designed to protect us in situations where . . . there's no exculpatory information, but you have one codefendant who takes a plea and then decides to take the fall for another codefendant. . . . I don't believe [this type of clause] induces anybody to testify in a particular way or to not testify, and . . . as the Court's heard, a couple times now, honestly, it makes no difference to me whether or not these people testify.

Indeed, the record reflects that the prosecutor stressed, on no fewer than three occasions, that she had no objection to the codefendants testifying, noting there was "plenty of information . . . to impeach them," and stating, "If they testify, I cross-examine them. That's fine." Such "information" included the codefendants' prior statements and was the fair and permissible "actual use" in this case of the special term in the plea agreements. *See State v. Campoy*, 220 Ariz. 539, ¶ 24, 207 P.3d 792, 801 (App. 2009) (rule barring admission of statements made in connection with plea bargain designed to promote candor during process; "it is not intended to provide defendants with a shield from the consequences of providing law enforcement officials with untruthful information in order to obtain a favorable plea agreement").

¶36 As the majority observes, the prosecutor also stated there was a "possibility that should they testify and should [her] office review this and feel a material portion of the plea was violated, there's a chance" her office could seek to withdraw the plea agreements. But that compounded conjecture should carry little weight. As explained above, construing the special term in question as a material condition of a plea agreement that neither requires nor prohibits testimony is problematic. And case law would strongly suggest that a merely arguable breach of an ambiguous provision[7] would not subject a defendant to any danger of rescission and double jeopardy. *See Aragon*, 209 Ariz. 61, ¶ 12, 97 P.3d at 890 (alleged violation of plea bargain's purpose would not be inferred to constitute a breach absent defendant's express agreement); *Coy*, 200 Ariz. 442, ¶¶ 9-10, 27 P.3d at 802 (no withdrawal permitted where alleged breach did not materially alter plea bargain).

¶37 Furthermore, notwithstanding comments by counsel and an unsworn statement by codefendant Orantes-Lerma, the substance of what either codefendant might actually testify to under oath on the witness stand is a matter of additional conjecture. But even if Orantes-Lerma were to provide exculpatory testimony on behalf of Sanchez-Equihua, his spouse, consistent with a post-plea statement he apparently made during his presentence interview,[8] he could not be found in violation of the special term of his plea agreement unless the state could establish that he clearly had misrepresented his knowledge at the time he entered into the agreement, rather than later on the witness stand. In my view, that scenario is too speculative and this issue too far afield from *Fisher* to conclude that the special term in question is unconstitutionally

---

[7]At one point, counsel for codefendant Gutierrez noted that if the codefendants were to testify, and if they "provide[d] information [the prosecutor]'s supervisor would believe is exculpatory . . . and attempts to set the plea aside, then I guess the next phase for us would be . . . an argument [to] the Court about what's exculpatory"?

[8]During a discussion with counsel, the trial court informed the parties that the codefendant's "presentence report . . . says that he exonerates her, she had nothing to do with it, she was just there."

coercive and improper. *Cf. State v. Rivera*, 210 Ariz. 188, ¶ 17, 109 P.3d 83, 86 (2005) ("All accomplice plea agreements put some pressure on a cooperating witness."); *Coy*, 200 Ariz. 442, n.4, 27 P.3d at 801 n.4 (waiver of double jeopardy strictly limited to reasons outlined in plea agreement); *Dominguez v. Meehan*, 140 Ariz. 329, 681 P.2d 912 (App. 1983) (same), *approved*, 140 Ariz. 328, 681 P.2d 911 (1984).

**¶38** Finally, my colleagues imply that I have "focused" too narrowly and "facially" on the plea agreement term at issue instead of Sanchez-Equihua's constitutional rights. But it is only through the majority's broad and speculative interpretation of that ambiguous provision that it concludes there has been a "constitutional violation" by the state. Contrary to the majority's suggestion, I do not ignore the record here, which includes the codefendants' voluntary representations in written plea agreements and in court that they lacked exculpatory information, the absence of any express condition in the plea agreements that could be "violated" by either codefendant testifying at Sanchez-Equihua's trial, and, how exactly her Sixth Amendment rights are abrogated by the codefendants' arguably superficial invocation of double jeopardy here. This is not a case like *Earp v. Ornoski*, 431 F.3d 1158, 1168 (9th Cir. 2005), cited by the majority for the principle that the government may not "substantially interfere" with a defense witness's choice to testify, in which the prosecutor threatened and verbally abused a cooperating inmate witness, forced him to recant a previous statement, and caused him to be transferred to a less desirable jail facility. Though in a different context, the Supreme Court has observed: "[A] trial court may not ignore the fundamental character of the defendant's right to offer the testimony of witnesses in his favor. But the mere invocation of that right cannot automatically and invariably outweigh countervailing public interests." *Taylor v. Illinois*, 484 U.S. 400, 414 (1988).

**¶39** Accordingly, although the parties generally presumed, and the trial court found, that Sanchez-Equihua's codefendants could be placed in jeopardy as a result of the no-exculpatory-information clause, thus depriving her of potential witnesses, a closer examination of the plea agreements and our case law strongly

suggests otherwise.  I would therefore remand this case for the trial court to reconsider its finding that jeopardy would attach if the codefendants were to testify, taking specific offers of proof and additional evidence if need be.[9]  Although it is possible either or both codefendants could potentially face additional consequences, for example as a result of perjury charges if such were warranted,[10] it would not be due to the special term in their agreements.  If the codefendants would nevertheless decline to testify, I would affirm Sanchez-Equihua's conviction.

---

[9]When this issue was discussed during a trial break, counsel for Sanchez-Equihua noted "[r]ight now we're dealing with speculation.  We have no idea if the state intends to pull these [plea agreements]."

[10]At one point in the discussions, the prosecutor noted that the codefendants had been placed under oath when they changed their pleas, and might face "some sort of perjury charge if they said something under oath and now they're saying they didn't."